FILED
OCT 21 2022
CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY ____ DEPUTY CLERK

Mark Aussieker
8830 Olive Ranch Lane
Fair Oaks, CA 95628
Phone: 916-705-8006
aussieker1@gmail.com
*in pro per*

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

MARK AUSSIEKER,
Plaintiff,
v.
TSHB LLC and NICO CONTRERAS,
Defendant(s)

No. 2:22-cv-1886-DAD-CKD (PS)

**COMPLAINT FOR DAMAGES**
Trial by Jury not requested

:

1. Plaintiff Mark Aussieker ("Plaintiff" or "Mr. Aussieker") brings this action to enforce the consumer-privacy provisions of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227, a federal statute enacted in 1991 in response to widespread public outrage about the proliferation of intrusive, nuisance telemarketing practices. See Mims v. Arrow Fin. Servs., LLC, 132 S. Ct. 740, 745 (2012).

2. The Defendants have placed telemarketing calls to a telephone number Mr. Aussieker owned without consent. Its not possible to "police" the estimated 60 billion robocalls made every year. The FCC Has Fined Robocallers $208 Million and It's Collected $6,790[1].

3. This Complaint also relates to the Defendants making telemarketing calls to individuals in the absence of any "do not call" policy or training, as well as making such calls to individuals who previously indicated that they did not want to receive telemarketing calls when they registered their number on the national do not call registry.

[1] https://www.wsj.com/articles/the-fcc-has-fined-robocallers-208-million-its-collected-6-790-11553770803

## PARTIES

4. Plaintiff Mark Aussieker is an individual and resident of the state of California, and this District.

5. TSHB LLC and ("TOP SHELF") is a California LLC. TOP SHELF is a "person" as defined by 47 US.C. § 153 (39).

6. NICO CONTRERAS ("NICO") is a natural person and is a sales person for TSHB

## Jurisdiction & Venue

7. The Court has federal question subject matter jurisdiction over these TCPA claims. Mims v. Arrow Financial Services, LLC, 132 S. Ct. 740 (2012).

8. Venue is proper pursuant to 28 U.S.C. § 1391 (b)(2) because the Plaintiff is a resident of this district, which is where he received the illegal telemarketing calls that are the subject of this lawsuit.

9. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred within this District.

10. DEFENDANT NICO resides in Northern California and worked for TOP SHELF during the time he contacted PLAINTIFF. DEFENDANT TOP SHELF maintains a physical location within the judicial district.

11. This Court has personal jurisdiction over the parties because Defendants called into the forum state by targeting a phone number in that forum and targeted the plaintiff. Likewise, Plaintiff's rights were violated in the State of California and his claims arose out of his contact with Defendants.

12. Plaintiff believes that DEFENDANTS had actual notice that he was a California resident because his phone number corresponds to a California area code

13. The defendant's forum related activities are unsolicited telemarketing calls to a California resident, the natural invasion of privacy harm of those calls would not have happened

but for the calls to California

**TCPA Background**

14. In 1991, Congress enacted the TCPA to regulate the explosive growth of the telemarketing industry. In so doing, Congress recognized that "[u]nrestricted telemarketing . . . can be an intrusive invasion of privacy [.]" Telephone Consumer Protection Act of 1991, Pub. L. No. 102-243, § 2(5) (1991) (codified at 47 U.S.C. § 227).

15. The national Do Not Call Registry allows consumers to register their telephone numbers and thereby indicate their desire not to receive telephone solicitations at those numbers. See 47 C.F.R. § 64.1200(c)(2). A listing on the Registry "must be honored indefinitely, or until the registration is cancelled by the consumer or the telephone number is removed by the database administrator." Id.

16. The TCPA and implementing regulations prohibit the initiation of telephone solicitations to residential telephone subscribers to the Registry. 47 U.S.C. § 227(c); 47 C.F.R. § 64.1200(c)(2).

17. A person whose number is on the Registry, and who has received more than one telephone call within any twelve-month period by or on behalf of the same entity in violation of the TCPA, can sue the violator and seek statutory damages. 47 U.S.C. § 227(c)(5).

18. The regulations exempt from liability a caller who has obtained the subscriber's signed, written agreement to receive telephone solicitations from the caller. 47 C.F.R. § 64.1200(c)(2)(ii). That agreement must also include the telephone number to which the calls may be placed. Id.

19. Any person whose receives any phone in violation 47 U.S.C. § 227(b)(1) (A) can sue the violator and seek statutory damages. 47 U.S.C §227(b)(3)(B). This is commonly refered to as the auto dialer statue or ATDS.

20. 47 U.S.C. § 227(b)(1) (A) to make any call (other than a call made for

emergency purposes or made with the prior express consent of the called party) using any automatic telephone dialing system or an artificial or prerecorded voice— (iii) to any telephone number assigned to a paging service, cellular telephone service, specialized mobile radio service, or other radio common carrier service, or any service for which the called party is charged for the call, unless such call is made solely to collect a debt owed to or guaranteed by the federal government."

21. All a plaintiff needs to show is that a call or text message was made using an auto dialer to a number assigned to cellular service, or that the calling party was charged for the call. In this case, plaintiff received calls sent to his cellular phone.

22. In Sengenberger v. Credit Control Services, Inc2., the court held that "intentionally" making phone calls that violated the TCPA was sufficient to warrant treble damages because "although neither the TCPA nor the FCC regulations define the terms 'willfully or knowingly'...courts have generally interpreted willfulness to imply only that an action was intentional. Further, Sengenberger noted that while the TCPA does not define willful, the Communications Act of 1943, of which the TCPA is a part, defines willful as "the conscious or deliberate commission or omission of such act, irrespective of any intent to violate any provision[ ], rule or regulation."

23. A corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. E.g., Jack on Five Star Catering, Inc. . Season, Case No. 10- 10010, 2013 US. Disk LEXIS 159985, at *10 (E.D. Mich. Nov. 8, 2013) C[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute. (internal quotation marks omitted)); Maryland v. Universal Elections, 787 F. Supp. 2d 408, 415 - 16 (D. Md. 2011) ( If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

-[2] SENGENBERGER v. CREDIT CONTROL SERVICES, INC. (N.D.Ill. 5-5-2010)

## Factual Allegations

24. Plaintiff MARK AUSSIEKER's phone number ending in 8006 is a cellular phone.

25. Plaintiff MARK AUSSIEKER's phone number ending in 8006 was added to the Do Not Call list in February 2003. See Exhibit A.

26. Plaintiff has maintained the same cell phone ending in 8006 continuously since 2002.

27. PLAINTIFF does not have a "landline" and primarily uses his cell phone as his home phone. He is a residential subscriber. He pays the phone bill with personal funds. He mainly uses his phone to communicate with friends and family.

28. PLAINTIFF did not provide Defendants his cell phone number. Plaintiff is informed and believes that Defendants obtained a list of homeowners in Sacramento County and "skip traced" the list to obtain the cell phone numbers of the owners. The fact that PLAINTIFF received a call for a property he does not own is indicative that the DEFENDANTS received his phone number by "Skip tracing" which is the process of locating someone who isn't readily available. In real estate, that means finding property owners' phone number since the property address and owners name is known.

29. On 6/2/2022 at 9:48 AM, PLAINITFF a call from 209-309-5602. The first call was answered and nobody came onto the line.

30. On 6/3/2022 at 4:18 PM PLAINITFF received a call from 209-299-4184. The second call showed caller ID as SPAM which indicates that the caller was spoofing his telephone number. The second call was answered, and PLAINTIFF said hello a few times. There was a long delay probably 2-3 seconds before a caller came onto the line and asked for Kimberly. PLAINTIFF offered to take a message, but the caller said he was was looking to purchase 5803 59th St since they had just recently sold some real estate and was looking to place the funds. Specifically, the caller mentioned that they sold 5639 35th Ave. The caller did not identify the

entity which behind the call so PLAINTIFF feigned interest. During the call it was revealed that the callers name was Nico and he was holding himself out to be a purchaser of real estate or could list the property since he was a real estate agent. During the call PLAINTIFF learned that the callers name was Nico and he was holding himself out to be a purchaser of real estate or could list the property since he was a real estate agent. Nico did not have PLAINTIFF's name since he is not on title for the property and was supplied the code name "Matt" so PLAINTIFF could trace subsequent calls.

31. On 6/3/2022 at 4:27 PM PLAINITFF received a text from 707-540-2482 which was NICO's contact information. PLAINTIFF learned that NICO was with TOP SHELF HOME BUYERS. NICO also supplied his email address indicating that he could communicate through email. It is alleged that NICO sent this text unsolicited because he knew the number that was displayed on PLAINTIFF's caller id (209-299-4184) was a non-working number.

32. PLAINTIFF texted the number back and asked to be placed on their internal do not call list and requested NICO send a copy of his internal do not call policy.

33. On 6/3/2022 at 4:230 PM PLAINITFF received a text from 707-540-2482 which stated "Matt, it's NICO, we just spoke about 59th st"

34. On 6/7/2022 at 5:05 PM PLAINITFF received a call from 279-356-8943 where the caller asked for Matt. PLAINTIFF asked the caller what the call was about and the caller said he was calling to see if he wanted to sell 5803 59th st. PLAINTIFF asked the caller if he was associated with Nico but the caller denied the accusation and was claiming that he was just calling people to see if they were interested in selling

35. PLAINTIFF has received many phone calls looking for Kimberly at his number seeing if she wanted to sell 5803 59th St but he cannot recall an instance where a caller asked for his real name since he is not on title. This is because the callers typically skiptrace the property address in order to get a phone number for the owner, like the first call from Nico where he was looking for Kimberly. The 6/7/22 call was also different because the caller specifically asked for

Matt and PLAINTIFF had given the code Matt a few days earlier. PLAINTIFF alleges that this was an underhanded attempt to contact him despite his request that NICO was not to not contact him anymore.

36. On 6/8/2022 at 5:06 PM PLAINITFF received a call from 707-540-2482 where the caller asked for Matt. The caller said his name was Nico. PLAINTIFF told Nico that he asked him to stop calling him via text message and NICO reiterated that he thought it was a mistake since they had previously spoken. PLAINTIFF told Nico that he called from an obviously spoofed phone number and he pretended to be interested so could identify the caller. Nico was upset and requested PLAINTIFF not to waste his time anymore. Nico suggested that after listening to his pitch, PLAINTIFF should have just told him he was not interested in selling. PLAINTIFF reminded him that he did ask him to stop calling and yet he continued to do so.

37. PLAINTIFF received calls intended to reach the owner of a property under the name of KIMBERLY AUSSIEKER. Even though he is not the owner of the property, PLAINTIFF believes that DEFENANDS "Skip traced" the property and texted any phone number they could find associated with that property.

38. PLAINTIFF called back 209-309-5602, 209-299-4184 and found them to be non-working.

39. PLAINTIFF compiled a list of the calls he received.

| Date | Time | Number | Caller id display | method |
|---|---|---|---|---|
| 6/2/2022 | 9:48 AM | 209-309-5602 | GROVELAND CA | call |
| 6/3/2022 | 4:18 PM | 209-299-4184 | STOCKTON CA | call |
| 6/3/2022 | 4:27 PM | 707-540-2482 | CONTRERAS ANGEL | text |
| 6/3/2022 | 4:30PM | 707-540-2482 | CONTRERAS ANGEL | text |
| 6/7/2022 | 5:05 PM | 279-356-8943 | Not Available | Call |
| 6/8/2022 | 5:06 PM | 707-540-2482 | CONTRERAS ANGEL | call |

40. The Telemarketing Sales Rule prohibits "abusive" telemarketing conduct3.

41. After the call concluded, PLAINTIFF researched the address given to me and found that no such sale had ever been made.

42. PLAINTIFF found an Instagram page for Top Shelf Home Buyers. Which led him to the Instagram page under the handle thenicocontreras. A photo of NICO is featured and he appears to be standing next to Mr.Torres who is the Member Manager of TSHB. Another person is tagged in the photo as abeltheneighbor who holds himself out to be the acquisitions director for TSHB. A video tour of the office showed many individuals on the telephone.

43. Abel aka abeltheneighbor has posted "stories" about his time working at THSB. He has categorized his stories under "Business", "Cold Calls", "Appointments", "Deals". One of his photos shows a bag of cash with approximately $20,000 and the following picture promotes that a vacant fixer in Pittsburgh California that was sold at $305,000 with an assignment fee of $45,000. Another photo under "appointments" promotes a "vacant condo" in Sacramento for $124,999. Another photo under "appointments" depicts a house in Oakland "Delivered vacant asking $349,999 PP 100,000 (PP could mean projected profit).

44. Abel aka abeltheneighbor has posted One photo under "business" features a photo of a bulletin board with the phrase "Grind Don't Stop, We Don't Stop" featured 8 "pending deals" with $32,000 shown on the last deal. Another section of the board shows "Buyers Needed" and has 3 deals. These facts indicate that THSB is marketing the property and is not purchasing the real estate.

45. Abel aka abeltheneighbor has posted "stories"which show a candid interview of NICO AKA thenicocontreras asserting that money is at the follow up. An opulent lifestyle is depicted with the gentleman driving around in imported luxury sedans. Abel's camera captures a

[3] The TSR specifically defines "abusive" conduct to include: telemarketers failing and refusing to adequately identify themselves, thus forcing the consumer to do what it takes to identify them himself or herself. See Section 310.4(b)(1)(ii) of the TSR - "abusive" conduct includes: "requiring the person to identify the seller making the call or on whose behalf the call is made"

fancy file folder made of gloss black paper with a golden embossed logo of TSHB. NICO also says he is an 18 years old making 5 figures a month. NICO explained in the interview that "the money is at the follow" which is why he continued to contact PLAINTIFF after being asked to not contact PLAINTIFF anymore.

46. "Real Estate Broker" is a service job and thus plaintiff alleges that the calls were to promote DEFENDANT's services. A real estate broker within the meaning Bus. & Prof. Code § 10131(a). is a person who, for a compensation or in expectation of a compensation, regardless of the form or time of payment, does or negotiates to do one or more of the following acts for another or others: sells or offers to sell, buys or offers to buy, solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the purchase, sale or exchange of real property or a business opportunity. Cal. Bus. & Prof. Code § 10131(a). Here, TSHB solicited prospective sellers and would later market the property to prospective buyers. ABELS instagram stories depict this business in detail.

47. Plaintiff alleges that TSHB would "WHOLESALE" the purchase agreement where he exchanges the real property sales contract and would be compensated by adding an assignment fee or making a spread between the contract purchase price and the assigned price. Either way, TSHB would be compensated for his services and the SELLER would pay for these services in the form of a lower purchase price amount.

48. Per 47 USC § 227(a)(4) A "telephone solicitation" means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person. Here, the call was to encourage the purchase of SEED's real estate services. The 12 calls were sent to Plaintiffs for the purpose encouraging the purchase of DEFENDANTS services.

49. AUSSIEKER alleges the messages the first two calls he received were part of an ATDS campaign, sent using a system that operated similarly to a traditional predictive dialer

because the phone numbers were spoofed to be from different area codes, and used non working telephone numbers, that were sent without his consent and without any relation to the company, and that there was no human intervention involved in their transmission. The 1st call abandoned which is indicative of a predictive dialer because the calls will disconnect when more people answer than the dialer. A predictive dialer will dial based on an estimated answer rate and when more people answer or talk longer than "predicted" the call center employees cannot connect and the dialer releases the calls. Its alleged that the calls were made using an ATDS because of the use of a predictive dialer[4].

50. Plaintiff complained and was told that NICO was terminated indicating he was an employee at the time the calls were made. ALEXANDER emailed plaintiff and said "Although We do thoroughly scrub the lists however, regretfully this one may have slipped through." PLAINTIFF recalls seeing NICO still tagged in social media after the alleged dismisal

51. All calls were willful and knowingly sent.

52. Using multiple caller ids is indicative that defendants are aware of their violative conduct and that the calls were being placed willfully and knowingly.

53. Defendant's calls constituted calls that were not for emergency purposes as defined by 47 U.S.C. § 227(b)(1)(A).

54. During all relevant times, Defendant did not possess Plaintiff's "prior express consent" to receive calls using an automatic telephone dialing pursuant to 47 U.S.C. § 227(b)(1)(A). The texts were impersonal advertisements because it was a scattershot effort to contact any phone number found for a property instead of knowing that the owner would be contacted.

55. All calls constitute solicitation calls pursuant to 47 C.F.R. § 64.1200(c)(2) as they were attempts to promote or sell Defendant's real estate broker services where he would

---

[4] See Code of Federal Regulations, Title 47, Parts 40 to 60, at 432 (2017) (codifying a June 26, 2003 FCC order).

solicit prospective sellers and buyers.

56. All calls constitute telemarketing calls pursuant to 47 C.F.R. § 64.1200(d) because they were made to encourage the purchase of DEFENDANTS services.

57. Mr. Aussieker's concrete injury as it relates to the Spokeo decision is loss of productivity for answering the call, decreased battery life, the nuisance of being bothered with unrequested solicitations. Although easier to recognize, the injury doesn't have to be "tangible," id., "like a picked pocket or a broken leg," to be concrete, Amrhein, 954 F.3d 328 (2020) at 330. Intangible injuries — like "the suppression of free speech or religious exercise" or the invasion of common-law rights "actionable without wallet injury" — can also be concrete. Id. at 331 See LAUFER v. ACHESON HOTELS, LLC United States Court of Appeals, First Circuit No. 21-1410 October 5, 2022. Page 12

58. Mr. Aussieker did not welcome these calls.

59. Defendant's calls harmed the Plaintiff by causing the very harm that Congress sought to prevent- a nuisance and invasion of privacy.

## TSHB as PURCHASER

60. In the event TSHB claims they are the "BUYER" and not in the business of assigning contracts, PLAINTIFF pleads an alternative theory.

61. PLAINTIFF searched the grantee index in Sacramento counties where NICO claimed a purchase was made and could not find a transaction where TSHB was a purchaser.

62. TSHB website lists the following services offered: Standard days to get an offer 1, Standard days to close 14, No closing costs or realtor fees, Set offers that won't change, No countless showings, No inspections or repairs.[5]

63. Defendant's calls constitute telemarketing/advertising because they promote Defendant's real estate services. Specifically, Defendant was attempting to solicit business from

[5] https://topshelfhomebuyers.co/

Plaintiff for the purpose of promoting and encouraging Plaintiff to invest time and money in Defendant's services and related services for which Defendant would have charged Plaintiff various fees in the form of a lower purchase price amount, including, but not limited to, fees related to (i) paying staff or performing the services that an agent would perform; (ii) performing needed repairs to sell; (iii) complying with statutory sale requirements ie, lead based paint, water heater strapping and bracing, CO2 or smoke detector installation, transfer disclosure statement and natural hazards disclosure statement; (iv) preparing and processing an assignment of the contract and the associated closing costs and transfer taxes; (v) complying with applicable disclosure laws and other laws pertaining to the transfer of property; (vi) obtaining a notarized signature to sign all necessary legal documents and file with the county recorder and (vii) paying off any liens, taxes, utility charges so title insurance could be purchased.

## AGENCY

64. Implied actual authority comes from a general statement of what the agent is supposed to do; an agent is said to have the implied authority to do acts consistent with that direction. Hawaiian Paradise Park Corp. v. Friendly Broadcasting Co., 414 F.2d 750, 755 (9th Cir. 1969)

65. Apparent authority arises from the principal's manifestations to a third party that supplies a reasonable basis for that party to believe that the principal has authorized the alleged agent to do the act in question. NLRB v. Donkin's Inn, 532 F.2d 138, 141 (9th Cir. 1976), cert. denied, 429 U.S. 895 (1976). If the District Council (principal) supplied a reasonable basis for Coker (third party) to believe that it had authorized Sorensen (agent) to modify the Standard Agreement, no ratification would be required. Nat'l Labor Relations Bd. v. District Council of Iron Workers of California & Vicinity, 124 F.3d 1094, 1099 (9th Cir. 1997) In PLAINTIFFS view, TSHB supplied PLAINTIFF a reasonable basis to believe that NICO who contacted PLAINTIFF was authorized to operate on behalf of TSHB because NICO was pictured working in the office of

TSHB and photographed with Mr. Torres.

**MANDATED SAFEGUARDS**

66. DEFENDANTS failed to record PLAINTIFF's do not call request.

67. Plaintiff requested a copy of DEFENDANTS internal do not call policy and did not receive a response. It is alleged that DEFENDANTS did not maintain an internal do not call policy.

68. PLAINTIFF complained that he got calls at his number even though it is on the Do Not Call Registry. It is alleged that DEFENDANTS do not train the staff in the use or existence of the National Registry.

**TSHB LLC and NICO CONTRERAS**

69. At all times relevant to the claims alleged herein, NICO CONTRERAS was employed by TSHB LLC, and each and every call was placed on behalf of the corporate entity headed by its Member Manager.

70. Under the TCPA, an individual may be personally liable pursuant to 47 U.S.C. § 217. This section provides the "act, omission, or failure … or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure … of such carrier or user as well as of that person." 47 U.S.C. § 217… In other words, if the corporate officer has been found to be more than tangentially involved in the conduct which has found to be in violation of the TCPA and was involved in the sending of calls or texts, he may be held personally liable.

71. If the members were personally involved in the illegal activity they are personally liable because they did the act themselves. See Texas v. AmBlastfax "Neither the TCPA nor the common law requires knowing or willful violations of the TCPA as a prerequisite to officer liability ,""Direct participation or authorization is sufficient ." PLAINTIFF alleges NICO

knew to supply PLAINTIFF with a "Real phone number" since NICO knew that the outgoing numbers displayed on caller id were non working. NICO received PLAINTIFFS Do not call request and ignored it.

72. PLAINTIFF pleads that he is in need of injunctive relief because there is a future harm. PLAINTIFF alleges that the DEFENDANTS skip traced a property owned by his wife. There are more properties in the area that are owned by PLAINTIFF's wife. The DEFNEDANTS business practice of skip tracing means its possible for DEFENDANT to contact him again on another property.

## CAUSES OF ACTION

## COUNT 1

### Violation of the Telephone Consumer Protection Act, 47 U.S.C. §227(c)(5) – Telemarketing Solicitations to National Do Not Call Registrants

73. Defendant placed 6 Telephone Solicitations to Plaintiff to solicit his services.

74. Defendant did so despite the fact that the Plaintiff's telephone numbers are on the national do not call registry. This is a violation of 47 C.F.R. §64.1200(c)(2).

75. Defendant did so despite not training its personnel on the existence or use of any internal "do not call" list which is a violation of 47 C.F.R. §64.1200(c)(2).

76. Accordingly, Plaintiff is entitled to an award of $500 in statutory damages for each violative telephone call pursuant to 47 U.S.C. § 227(c)(5). Defendant violated multiple regulations promulgated under 47 U.S.C. § 227(c)(5)(B).

77. Plaintiff s entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5)(C).

## COUNT 2

**(Telemarketing Without Mandated Safeguards, 47 C.F.R. § 64.1200(d))**

**(Against All Defendants)**

78. Mr. Aussieker relleges and incorporates by reference each and every allegation set forth in the preceding paragraphs.

79. The foregoing acts and omissions of Defendants and/or their affiliates or agents constitute multiple violations of FCC regulations by making telemarketing calls despite lacking:

written policy, available upon demand, for maintaining a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(1)[6];

training for the individuals involved in the telemarketing on the existence of and use of a do-not-call list, in violation of 47 C.F.R. § 64.1200(d)(2)[7];

recording the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made., in violation of 47 C.F.R. § 6 4.1200(d)(3)[8].

80. Defendant placed 6 Telemarketing calls to the Plaintiff to solicit his services.

81. Accordingly, Plaintiff is entitled to an award of $500 in statutory damages for each violative telephone call pursuant to 47 U.S.C. § 227(c)(5). Defendant violated multiple regulations promulgated under 47 U.S.C. § 227(c)(5)(B) More Sepecifically DEFENDANTS violated . 47 C.F.R. § 64.1200(d)(1-3)

82. Plaintiff s entitled to an award of up to $1,500 in damages for each such knowing or willful violation. 47 U.S.C. § 227(c)(5)(C). Here, NICO willfully and knowingly failed to honor PLAINTIFF DNC request.

83. Counts one and two are promulgated under the same section of 47 U.S.C. §227(c)(5)(B). However, count 2 is under the regulations 47 C.F.R. § 64.1200 (d) which governs "telemarketing calls", that are defined as "The term telemarketing means the initiation of a

---

6 See Code of Federal Regulations, Title 47, Parts 40 to 60, at 425 (2017) (codifying a June 26, 2003 FCC order).

7 See id at 425 (codifying a June 26, 2003 FCC order).

8 See id at 425 - 26 (codifying a June 26, 2003 FCC order).

telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." See 47 CFR 64.1200(f)(13). Whereas COUNT 1 relates to the regulations found at 47 C.F.R. § 64.1200 (c) regarding "Telephone Solicitations which is defined as The term telephone solicitation means the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person, but such term does not include a call or message: (i) To any person with that person's prior express invitation or permission; (ii) To any person with whom the caller has an established business relationship; or(iii) By or on behalf of a tax-exempt nonprofit organization See 47 CFR 64.1200(f)(15). These violations have different elements and defenses.

## COUNT 3

**Violation of the Telephone Consumer Protection Act, 47 U.S.C.**

**§227(b)(1)(A)(iii)** – Auto Dialer

84. Plaintiff hereby incorporates, as if fully rewritten herein, all foregoing paragraphs.

85. Defendant placed 4 phone calls to the Plaintiff using an automatic dialer

86. Defendant's own conduct (by placing a Call to Plaintiff's telephone using an automated dialing system, violated 47 C.F.R. § 64.1200(a)(2) and 47 U.S.C. § 227(**b**)(**1**)(**A**)(**iii**) and, therefore, Plaintiff is entitled to an award of statutory damages in the minimum amount of $500 for this violation.

87. As a result of Defendant's knowing and/or willful violations of 47 U.S.C. § 227(b), Plaintiff is entitled to an award of $1,500.00 in statutory damages, for each and every violation, pursuant to 47 U.S.C. § 227(b)(3)(B) and 47 U.S.C. § 227(b)(3)(C).

## COUNT 4

**California Civil Code Section 3294 Punitive Damages**

88. Plaintiff hereby incorporates, as if fully rewritten herein, all foregoing paragraphs.

89. Defendant placed 2 phone calls to the Plaintiff where the caller id was spoofed. Section 227(e), also known as the Truth in Caller ID Act, prohibits "caus[ing] any caller identification service" in connection with any IP-enabled voice service or telecommunications service to "knowingly transmit misleading or inaccurate caller identification information with the intent to defraud, cause harm, or wrongfully obtain anything of value[.]"9 The calls at issue were most likely a VOIP phone because the calls showed SPAM on PLAINTIFF's phone which means that DEFENDANT's carrier did not transmit authentication tokens, which would appear if the caller id was spoofed. STIR/SHAKEN requires voip carriers to authenticate the caller ID that is transmitted. PLAINTIFF pleads that the calls were knowingly transmitted" because NICO supplied PLAINTIFF with his "real number" which is indicative that he knew the other number was non-working.

90. Caller ID Spoofing robs consumers of the ability to bring suit against the tortfeasors who utilize said spoofing technology – it also and further prevents consumers from utilizing call blocking tools to mitigate their harm and damages because the Caller ID spoofing software that is integrated and conjoined to their ATDS Technology utilized a random number generator that transmits different local neighborhood spoofed numbers each time it dials the consumer.

91. It was the Defendants' clear intent to unjustly enrich themselves at the expense of the consumer (by shifting the burden of) wasted time, and physical and mental energy; and by use of the technology that would ensure that a consumer could never articulate precisely how many calls they placed to consumer before they got caught, and with the deliberate intent to never 'get caught'.

92. Under CA civil code section 3294 "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the defendant with the intention on the part of the defendant of thereby depriving a person of property or legal rights or otherwise causing injury. HERE, DEFENDANT misrepresented the caller id, concealed the true caller id which is a material fact when

[9] 47 U.S.C. § 227(e)(1); *see also* 47 CFR § 64.1604.

seeing who is calling, that deprived PLAINTIFF of his legal rights if there are calls which are unknown to him, deprived him of his legal right to have callers transmit accurate caller id and caused injury by depriving him the ability call the number back and make a do-not-call request during regular business hours.

93. Although easier to recognize, the injury doesn't have to be "tangible," id., "like a picked pocket or a broken leg," to be concrete, Amrhein, 954 F.3d 328 (2020) at 330. Intangible injuries — like "the suppression of free speech or religious exercise" or the invasion of common-law rights "actionable without wallet injury" — can also be concrete. Id. at 331 See LAUFER v. ACHESON HOTELS, LLC United States Court of Appeals, First Circuit No. 21-1410 October 5, 2022. Page 12

94. The court should consider, the (1) the nature of defendant's acts; (2) the amount of compensatory damages awarded; and (3) the wealth of the defendant. The nature of the DEFENDANTS acts were willful, knowing, meticulously calculated and in direct violation of the law. The compensatory damages are a pittance compared to the amount of money that DEFENDANTS are making. NICO is making 5 figures a month, driving around in luxury import sedans, with co workers who have problem putting videos up with three "straps" [10] of cash amounting to $15,000 and another $10,000 in $100 bills. TSHB had eight pending contracts and three buyers needed. The website says they close within 14 days. The figures taken from the website show that TSHB was making $25,000 -$50,000 on some deals. The company generated a $45,000 assignment fee on a $305,000 transaction. PLAINTIF believes that 5%-6% is typical for the area with Judge Sargis approving a 6% commission in the sale of real property see (HUSTED V. GILBREATH 18-20964-E-7 #196 10/13/22). $45,000 fee on a $305,000 transfer is 12.8%[11]. PLAINTIFF infers that the majority of these profits are attributed to cold calling because ABEL posted a timeline which highlighted "Cold calling".

[10] A currency strap, or *"bandz"* is a piece of paper wrapped around 100 bank notes.
[11] PLAINTIFF divided 45/350

PRAYER FOR RELIEF

WHEREFORE, Plaintiff requests judgment against TSHB LLC and NICO CONTRERAS, jointly and severally for the following:

1. Injunctive relief prohibiting such violations of the TCPA by Defendants in the future.

2. For an order finding for plaintiff in all counts.

3. For an order finding the defendant knowingly and willfully violated TCPA

4. An award of $500 per call for the 6 calls under Count One which amounts to $3,000 in statutory damages as prescribed under 47 U.S.C. § 227(c)(5)(B) for each call that violated 47 C.F.R. § 64.1200(c). This amount be tripled to $9,000 as prescribed under 47 U.S.C. § 227(c)(5)(C).

5. An award of $500 per call for the 6 calls under Count 2 which amounts to $3,000 in statutory damages as prescribed under 47 U.S.C. § 227(c)(5)(B) for each call that violated 47 C.F.R. § 64.1200(d). This amount be tripled to $9,000 as prescribed under 47 U.S.C. § 227(c)(5)(C).

6. An award of $500 per call for the 2 calls which amounts to $1,000 in statutory damages as prescribed under 47 U.S.C. § 227(b)(3)(B) This amount be tripled to $3,000 as prescribe under 47 U.S.C. § 227(b)(3)(C)

7. An award of punitive damages under CA Civil code §3294

3.

Respectfully Submitted this 19th Day of October, 2022.

Certification and Closing Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date of signing: 19th Day of October, 2022..

Signature of Plaintiff

Printed Name of Plaintiff _Mark Aussieker

# Exhibit A

https://mail.g

Getting Started Most Visited

Gmail

Mark Aussieker <aussieker1@gmail.com>

**National Do Not Call Registry - Your Registration Is Confirmed**

1 message

**Verify@donotcall.gov** <Verify@donotcall.gov> Wed, Feb 13, 2019 at 6:53 PM

To: aussieker1@gmail.com

Thank you for registering your phone number with the National Do Not Call Registry. You successfully registered your phone number ending in 8006 on June 28, 2003. Most telemarketers will be required to stop calling you 31 days from your registration date.

Visit https://www.donotcall.gov to register another number or file a complaint against someone violating the Registry.

**************************************************************************************************************************

Please do not reply to this message as it is from an unattended mailbox. Any replies to this email will not be responded to or forwarded. This service is used for outgoing emails only and cannot respond to inquiries.