1  Mark Aussieker
2  8830 Olive Ranch Lane
   Fair Oaks, CA 95628
3  Phone: 916-705-8006
4  aussieker1@gmail.com
5  *in pro per*

**FILED**

MAY 2 5 2023

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
         DEPUTY CLERK

6
7
8
9
10
11                        UNITED STATES DISTRICT COURT
12                        EASTERN DISTRICT OF CALIFORNIA
13

| 14  Mark Aussieker, | No. 2:22-cv-01886 **-DAD-CKD** |
| 15              Plaintiff, | |
| 16     v. | **PLAINTIFF'S MOTION FOR ENTRY OF** |
| 17  TSHB LLC and NICO CONTRERAS, DEFENDANT. | **DEFAULT JUDGMENT and Declaration in Support of ENTRY OF DEFAULT AGAINST** TSHB LLC and NICO CONTRERAS Judge Carolyn K. Delaney |
| 18 | |
| 19 | **Date :** **Courtroom**, 24, 8th floor |
| 20 | |

21
22  Plaintiff MARK AUSSIEKER ("Plaintiff"), moves for entry of default judgment against
23  TSHB LLC and NICO CONTRERAS and, in support, states as follows:
24
25  I.    SUMMARY OF MOTION
26  Copies of the Complaint and Summons were served on DEFENDANT TSHB LLC on
27
28

                                        1

11/2/22 [1]. The manner and method is described in the declaration in support of service[2]. In addition, in the Ninth Circuit, "service can be made upon a representative so integrated with the organization that he will know what to do with the papers. Generally, service is sufficient when made upon an individual who stands in such a position as to render it fair, reasonable and just to imply the authority on his part to receive service."[3]   ABLE told the processor that he was authorized to accept service[4]. Able is the Director of Acquisitions for the TSHB[5] which would be a senior leadership position in a business that buys houses. ABLE's leadership role is supported because ABLE knew NICO's monthly compensation which would be expected if ABLE was in charge of acquisitions and is also praising NICO about his relentless follow-up in securing a deal that NICO worked on for a month[6]. Knowledge of compensation and employee praise are consistent actions with leadership roles. Plaintiff emailed the member manager for TSHB on multiple occasions [7] but a responsive pleading has not been filed[8].

Copies of the Complaint and Summons were served on NICO CONTRERAS  on 12/16/22[9] . The manner and method is described in the declaration in support of service[10]. On the day NICO's  answer was due, PLAINTIFF received 3 phone calls that promised a "cross complaint for fraud",  from an anonymous caller who was soliciting interest in buying a

---

[1] . (See Proof of Service, filed at Dkt  5).
[2] Dkt 5. Page 1
[3] Direct Mail Specialists, Inc. v. Eclat Computerized Techs., Inc., 840 F.2d 685, 688 (9th Cir. 1988) (stating that service of process is not limited solely to officially designated officers, managing agents, or agents designated to receive process).
[4] Dkt 5. Page 1
[5] Docket No. 1 at pp.8, ¶¶42, Plaintiff declaration in support of default judgment ¶4
[6] Dkt 1. Page 8/9 ¶45, Plaintiff declaration in support of default judgment ¶10
[7] Plaintiff declaration in support of default judgment ¶5
[8] Plaintiff declaration in support of default judgment ¶6
[9] Proof of Service, filed at Dkt 8
[10] ibid

house from PLAINTIFF[11]. The fact that the caller used the word "Cross complaint" is indicative that the caller had been sued. The caller called from area code 209 which corresponds to the initial calls received in the complaint[12]. The caller displayed caller id that corresponds to the same carrier (Synch) as the call on 6/3/2022[13]. The timing and characteristics of the calls suggest that either NICO placed the call or someone who was connected to TSHB. A responsive pleading has not been filed[14].

To date, DEFENDANT TSHB LLC has not filed a responsive pleading as required by the Federal Rules of Civil Procedure. Plaintiff requested that the clerk enter a default and the Clerk entered default of the DEFENDANT on 12/5/2022[15] To date, DEFENDANT NICO CONTRERAS  has not filed a responsive pleading as required by the Federal Rules of Civil Procedure. Plaintiff requested that the clerk enter a default and the Clerk entered default of the DEFENDANT on 01/19/2023 (ecf No. 10)[16]

DEFENDANT, NICO CONTRERAS, is not a minor, incompetent or on active duty under the Soldiers' and Sailors' Civil Relief Act of 1940[17].  TSHB is not an incompetent.

## II.    LEGAL STANDARD

"Before a court can enter a default judgment against a DEFENDANT, a plaintiff must satisfy the procedural requirements set forth in Federal Rules of Civil Procedure 54(c) and 55(a), requires that the movant submit a declaration establishing: (1) when and against whom default was entered; (2) identification of the pleading entering default; (3) whether

---

[11] Plaintiff declaration in support of default judgment ¶8
[12] Dkt 1. Page 5 ¶30
[13] Plaintiff declaration in support of default judgment ¶9
[14] Dkt No. 10
[15] Dkt No. 7
[16] Dkt No. 10
[17] Plaintiff declaration in support of default judgment ¶7

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

the defaulting party is a minor, incompetent person, or active service member; and (4) that the defaulting party was properly served with notice." Id. Federal Rule of Civil Procedure 55(b)(2) authorizes district courts discretion to grant default judgment after the Clerk enters default under Rule 55(a). Aldabe v.Aldabe, 616 F.2d 1089, 1092 (9th Cir. 1980).

When moving for a default judgment, the well-pleaded factual allegations in the complaint are accepted as true, with the exception that allegations as to the amount of damages must be proved. TeleVideo Sys., Inc. v. Heidenthal, 826 F.2d 915, 917-18 (9th Cir. 1987) (per curiam).

"In exercising its discretion, the Court considers the Eitel factors: (1) the possibility of prejudice to plaintiff; (2) the merits of plaintiffs substantive claim; (3) the sufficiency of the complaint; (4) the sum of money at stake; (5) the possibility of a dispute concerning material facts; (6) whether DEFENDANT's default was due to excusable neglect; and (7) the strong policy underlying the Federal Rules of Civil Procedure favoring decisions on the merits." W Veg-Produce, Inc., 2018 U.S. Dist. LEXIS 63863, at **4-5 (citing Eitel v. McCool, 782 F.2d 1470, 1471-72 (9th Cir. 1986)). On an application for a default judgment, the factual allegations in the complaint are taken as true, with the exception of those regarding damages. See Geddes v. United Financial Group, 559 F.2d 557,560 (9th Cir. 1977); Consumer Fin. Prat. Bureau v. Siringoringo,No. 14-01155, 2016 U.S. Dist. LEXIS 4272, at *4-5 (C.D. Cal. Jan. 7, 2016). "The Court need not make detailed findings of fact in the event of a default judgment." YS Park Profl, Inc. v. Saco Store, No. 17-5065, 2018 U.S. Dist. LEXIS 49717, at *5-6 (C.D. Cal. Mar. 23, 2018) (citing Adrianaint'l Corp. v. Thoeren, 913 F.2d 1406, 1414(9th Cir. 1990).

4

1

### III.  JURISDICTION AND VENUE

2

3

4

5

6

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this action arises under a United States federal statute, specifically the Telephone Consumer Protection Act, 47 U.S.C. § 227 et seq., ("TCPA"). The TCPA specifically authorizes this Court to exercise jurisdiction.

7

8

9

10

11

12

13

This Court has personal jurisdiction over parties because DEFENDANTs systematically and continually have conducted business in the State of California. DEFENDANT NICO CONTRERAS  AND TSHB held itself out as if they were in California[18] by calling only from area codes associated within this forum and were served within this district.  Plaintiff's rights were violated in the State of California and his claims arose out of his contact with DEFENDANTs while in California.

14

15

16

17

18

19

Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(1) and/or (b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this District, and the robocall were received in this District.  Plaintiffs area code where he received calls corresponds to the forum. See Luna v. Shac, LLC, 2014 U.S. Dist. LEXIS 96847, *11(N.D. Cal. July 14, 2014)

20

### IV.  ARGUMENT

21

22

A.    Rule 54(c), 55(a)

23

24

25

26

27

"A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings." FED. R. CIV. P. 54(c). The default judgment does not seek more than is demanded in the Complaint. Rule 55(a) requires entry of default by the clerk, which has occurred. A declaration regarding service, which is satisfied by the AUSSIEKER

28

---

[18] Dkt 5. Page 9/10 ¶27 area code 916 and 209 are associated within the Eastern District

Declaration, submitted herewith.

      B.     Application of Eitel Factors

             Possibility of Prejudice In Event Default Judgment is Not Issued

      Plaintiff will be prejudiced if default judgment is not granted against DEFENDANT. DEFENDANT's have ignored this lawsuit, and will likely continue its unlawful robocalling activities if the Court fails to enter the Judgment. In exercising discretion to enter a default judgment, the first Eitel factor courts may consider is the possibility of prejudice to the plaintiff if a judgment default is not entered. Eitel, 782 F.2d at 1471. Here, absent a default judgment, Plaintiff will have no other recourse recover its monetary damages. Even if DEFENDANT merely delays this suit, electronic evidence yet to be discovered will be lost. When a telemarketer calls, the telephone number so provided or displayed on caller id must permit any individual to make a do-not-call request during regular business hours[19] which also allows people to confirm the identity. There is discoverable information kept by phone companies that prove plaintiffs claims and also may result in additional violations being discovered. DEFENDANT could seek a windfall in the form of non-liability because they illegally spoofed the caller id of the calls to mask the identity of the calling party[20]. Plaintiffs lack of other recourse represents a sufficient likelihood of prejudice that weighs strongly in favor of granting default judgment. See PepsiCo Inc. v. Cal. Sec. Cans, 238 F. Supp. 2d 1172, 1177 (C.D. Cal. 2002) ("If Plaintiffs' motion for default judgment is not granted, Plaintiffs will likely be without other recourse for recovery)."

---

[19] See 47 C.F.R. § 64.1601(e).
[20] See 156 Cong. Rec h2522, h2h24

6

2. Merits of Substantive Claims

    1.    Under the second and third Eitel factors, the Court must examine whether the plaintiff has pled facts sufficient to establish and succeed on its claims. See Eitel, 782 F.2d at 1471. These factors require the complaint "state a claim on which the plaintiff may recover." PepsiCo, 238 F. Supp. 2d at 1175. Plaintiff argues he has stated a prim a facie claim under the TCPA for both a willful and a negligent violation. Plaintiffs alleged substantive facts that DEFENDANTs violated the TCPA, and included a reference to 47 U.S.C. § 227, which is the appropriate cause of action to sue for damages for [21]. Plaintiffs alleged substantive facts that he is entitled to punitive damages and included a reference to CA Civil code §3294 which is the appropriate cause of action to get punitive damages [22].

    2.    Sufficiency of the Complaint

In considering the sufficiency of the complaint and the merits of the plaintiff's substantive claims, facts alleged in the complaint not relating to damages are deemed to be true upon default[23].

*Plaintiff's claim under Counts 1 and 2*

Plaintiff has set forth a well-plead Complaint, and has listed all the essential facts and elements as to its cause of action against DEFENDANT under 47 USC §227(c)(5). Because Section 227(c) merely authorizes the FCC to create regulations, Mr. Aussieker is really suing under the regulations. Plaintiff is the subscriber for his cell phone[24] that he registered on the Do Not Call registry[25], and pleads facts showing it is a residential line[26], where he

---

[21] Docket No. 1 at pp.14, ¶73-77, and pp.15 ¶78-83
[22] Docket No. 1 at pp.18-19, ¶88-94
[23] *Bd. of Trustees of Sheet Metal Workers v. Moak*, Case No. 4:11-cv-04620-CW, 2012 WL 5379565, at *2 (N.D. Cal. Oct. 31, 2012) (citing *Geddes v. United Fin. Group*, 559 F.2d 557, 560 (9th Cir. 1977); Fed. R. Civ. P. 8(d)).
[24] Docket No. 1 at pp.5, ¶27,
[25] Docket No. 1 at pp.5, ¶25

7

received calls from DEFENDANT.  The Supreme Court has held that "residential" encompasses cellular phones[27].  Aussieker suffered a concrete injury by receiving these calls[28]. "The 2003 TCPA Order ruled that wireless users may receive the protections afforded to residential subscribers. That Order expressly concludes that "Congress has indicated its intent to provide significant protections under the TCPA to wireless users," and that "allowing wireless subscribers to register on a national do-not-call list furthers the objectives of the TCPA "[29].  DEFENDANT initiated the calls without an established relationship or permission because PLAINTIFF did not give DEFENDANT his phone number[30]. AUSSIEKER confirmed the identity of the caller after getting a text message the caller's business card[31].  The business card featured the caller's name and the company "TOP SHELF HOMEBUYER". AUSSIEKER allegations show a practice of illegal telemarketing to spoof the caller's telephone number[32] and contining to call after requesting the calls to stop[33].

Aussieker pleads that the calls he received were solicitations. "Solicitation" and "telemarking" are defined as "the initiation of a telephone call or message for the purpose of encouraging the purchase or rental of, or investment in, property, goods, or services, which is transmitted to any person." 47 C.F.R. §§ 64.1200(f)(13), (15).   Aussieker notes that different courts have reached different conclusions regarding calls to promote real estate services. The case law has varied whether or not a call inquiring about the interest in

---

[26] Docket No. 1 at pp.5, ¶27
[27] Campbell-Ewald Co. v. Gomez, 577 U.S. 153 (2016), aff'g Gomez v. Campbell-Ewald Co., 768 F.3d 871, 876-77 (9th Cir. 2014).
[28] Docket No. 1 at pp.11, ¶59
[29] Chennette v. Porch.Com, Inc., 50 F.4th 1217, 1227 (9th Cir. 2022) also 2003 TCPA Order at14037-38
[30] Docket No. 1 at pp.5, ¶28
[31] Docket No. 1 at pp.6 ¶31
[32] Docket No. 1 at pp 7 ¶38
[33] Docket No. 1 at pp.6 ¶32

8

selling a house is a solicitation or an inquiry about a purchase. One case in the 9th circuit has addressed the issue but the case is not exactly on point and has been critiqued as being cursory[34].

. In Jance v. Homerun Offer LLC[35] the court ruled "Plaintiff [Jance] alleges that the purpose of the calls was to purchase [Jance]'s home, not to induce Jance to make a purchase from the caller. Because the TCPA clearly defines the terms solicitation and telemarketing, and that definition does not include offers to purchase, [Jance] fails to state a claim under § 227(c)[36]". The problem appears to be that the court in Jance was not given much to work with. In Jance's 94 page amended complaint, only one sentence is made that alleges the calls were a solicitation; "The purpose of Defendants calls was to solicit plaintiff to conduct business with the defendant."[37] JANCE did not offer any supporting facts or allegations in the complaint that allege any sort of purchase of defendants services. It appears that Jance solely relied upon Fischbein v. Olson Research Group, Inc. 959 F. 3d 559-568 in his opposition as the reason why "solicitations to purchase count as advertisements under the TCPA". Unfortunately for Jance, Fischbein v. Olson Research Group was a TCPA case brought under 47 U.S.C. § 227(b)(1)(C) which makes is illegal to send "unsolicited advertisements" to fax machines, without the express permission of the recipient. Jance was suing under 47 U.S.C. § 227(c) which is a completely different tort with different elements that deal with "telephone solicitation". Conflating the two torts was fatal to Jance's argument because he anchored his opposition for a motion to dismiss on case law that applied

---

[34] "court's analysis is cursory, but one could certainly make the argument that selling a home is no different from selling a right to a structured settlement. But Jance does not further analyze the issue." Anderson v. Catalina Structured Funding, Inc., No. 1:21-cv-197, 2021 U.S. Dist. LEXIS 242657, 2021 WL 8315006, at *5-6 (W.D. Mich. Dec. 21, 2021)

[35] , No. CV-20-482, 2021 U.S. Dist. LEXIS 143145, 2021 WL 3270318 (D. Ariz. July 30, 2021),

[36] Jance v. Homerun Offer, LLC, No. CV-20-00482-TUC-JGZ, 2021 U.S. Dist. LEXIS 143145, at *13 (D. Ariz. July 29, 2021)

[37] Jance v. Homerun Offer, LLC 4:20-cv-00482-JGZ   DKT 16  ( E.D. AZ 12/03/20 )  Page 7 ¶ 24.

to a different violation under the TCPA.

Jancé failed to prove that the leads or offers were being sent to All Star Investment. "SAC does not include any facts which would support Plaintiff's allegation that some or all of the six property purchases made by All Star investments between October 2019 and June 2020, came about as the result of the telemarketing activities of Homerun Offer". Jance, identified that the calls were coming from Homerun Offer (HRO) calls for almost six months and found that the member manager of HRO to be Ryan Pineda. The same individual (Ryan Pineda) is the President and CEO of [All Star Investments]. HRO had not purchased any real estate in the Plaintiff's county (Pima, AZ) whereas the county recorder database did show six "property purchases" for All Star Investments. Homerun Offer was clearly calling people to make offers on properties and the business name "Homerun Offer" suggests that the business is in the business of making offers. What exactly did Homerun Offer do with the offers? This is relevant because AUSSIEKER believes that JANCE failed to recognize that HOMERUN OFFER was essentially "brokering" under Arizona law because HRO was assisting another party, perhaps ALL STAR in the procuring of prospects, calculated to result in the sale of real estate. Arizona Revised statutes define a real estate broker AZ Rev Stat § 32-2101 (2016) 48. " Real estate broker" means a person, other than a salesperson, who, for another and for compensation: (i) Assists or directs in the procuring of prospects, calculated to result in the sale, exchange, leasing or rental of real estate, businesses and business opportunities or timeshare interests.  Or (h) Advertises or holds himself out as being engaged in the business of buying, selling, exchanging, renting or leasing real estate, businesses and business opportunities or timeshare interests or counseling or advising regarding real estate, businesses and business opportunities or timeshare interests

AUSSIEKER requests that this court consider the possibility that JANCE failed to argue that HOME RUN OFFER was acting like a real estate broker and also failed to plead that that the call was to encourage the purchase of services.  Aussieker makes these points in his motion which is why the case is not exactly on point.

Compare JANCE to the case Eagle v. GVG Capital, LLC  in District Court for the Western District of Missouri where "EAGLE" received text messages that solicited her interest in selling her home.  EAGLE alleged that "DEFENDANT (GVG CAPITAL) sought to offer 'home selling services' akin to those offered by real estate agents" [38]. GVG texted EAGLE and directed her to visit GVG's website and submit EAGLES information to the website where GVG would sell the information to investors[39]. GVG moved to dismiss the Count for violating 47 USC §227(c) because EAGLE "fails to allege a telephone solicitation." Specifically, GVG argued that it "is alleged to have made an offer to buy [EAGLE's] property, pure and simple. As [GVG] is not alleged to have sent texts encouraging EAGLE to buy or rent anything, it did not make a telephone solicitation." The court ruled against the motion to dismiss and reasoned as follows[40]:

> The FCC has provided guidance on the meaning of solicitation in the real estate context. According to the FCC, "a telephone solicitation would include calls by real estate agents to property owners for the purpose of offering their services to the owner, whether the property listing has lapsed or not." In the Matter of Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991, 20 F.C.C. Rcd. 3788, 3793 ("2005 FCC Report"). In contrast, "calls by real estate agents who represent only the potential [*7] buyer to someone who has advertised their property for sale, do not constitute telephone solicitations, so long as the purpose of the call

---

[38] Eagle v. GVG Capital, LLC - 4:22-cv-00638  Missouri Western District Court 1/31/23 DKT 25, pg 6 footnote 4

[39] (Eagle v. GVG Capital, LLC - 4:22-cv-00638 (Doc. #1, ¶ 24.)

[40] Eagle v. GVG Capital, LLC, No. 22-cv-00638-SRB, 2023 U.S. Dist. LEXIS 15834, at *6-7 (W.D. Mo. Jan. 31, 2023

is to discuss a potential sale of the property to the represented buyer[.]" Id.

Based in part on this guidance, the Court finds that Count I adequately alleges a solicitation. Although DEFENDANT may not technically be a real estate agent, the Complaint alleges that the text messages offered home selling services to Plaintiff.... Consequently, the Court rejects DEFENDANT's argument that Plaintiff has failed to adequately allege a solicitation. See 2005 FCC Report, at 3793 (stating that solicitation includes "calls by real estate agents to property owners for the purpose of offering their services to the owner"); Panacci v. A1 Solar Power, Inc., Case No. 15–cv–00532–JCS, 2015 WL 3750112, at *6 (N.D. Cal. June 15, 2015) ("[R]eferring a consumer to another entity is a prohibited purpose if the purpose of the referral is to encourage a purchase, even . . . a purchase from another entity or a future purchase.")

)

Eagle v. GVG Capital, LLC was decided 5 days after the opposite conclusion was reached in Pepper v. GVG Capital LLC (same DEFENDANT, same basic set of facts, different lawsuit, and different district). GVG moved to dismiss the Count for violating 47 USC §227(c) because PEPPER "fails to allege a telephone solicitation." The court found that GVG Texas did not "solicit" Pepper because Pepper alleges only that "GVG Capital seeks to acquire data on behalf of others seeking to purchase real estate. The allegations do not support an inference that GVG Capital is offering a service to Pepper in exchange for any payment"[41]. Both PEPPER AND GVG TEXAS cited Anderson v. Catalina Structured Funding, Inc. in their moving briefs[42], (finding that calls offering to purchase the plaintiff's structured settlement qualified as a telephone solicitation under the TCPA because the caller was also offering the service of turning a long-term income stream into immediate cash) and Buja v. Novation Capital, [43] (finding that calls offering to purchase structured settlements were initiated to encourage the purchase of services provided by structured settlement purchasers)). GVG argued and the court agreed that GVG TEXAS was different

[41] Pepper v. GVG Capital LLC, No. H-22-2912, 2023 U.S. Dist. LEXIS 7394, at *8 (S.D. Tex. Jan. 17, 2023)
[42] Anderson v. Catalina Structured Funding, Inc., No. 1:21-cv-197, 2021 U.S. Dist. LEXIS 242657, 2021 WL 8315006, at *5-6 (W.D. Mich. Dec. 21, 2021)
[43] Buja v. Novation Capital, LLC, No. 15-81002, 2017 WL 10398957, *7 (S.D. Fla. Mar. 31, 2017)

than CATALINA because in Anderson, Catalina was both the service provider and the purchaser. The court reasoned

> The same cannot be said of GVG Capital. Pepper alleges only that "[GVG TEXAS] is a real estate lead generator in the business of acquiring consumer data to assist investors and realtors buy and sell homes, for profit." Pepper alleges that GVG Capital acts "on behalf of real estate agents and investors." Pepper does not allege that a consumer pays for any part of the services GVG Capital offers, or allege that GVG Capital offers to purchase homes, in contrast to the role Catalina played in purchasing structured settlements" [44].

Plaintiff requests that this court consider the possibility that PEPPER failed to point out that GVG was acting like a real estate broker or "Real Estate Agent[45]" in finding motivated sellers for compensation and according to TEXAS law[46] anyone who "procures or assists in procuring a prospect to effect the sale, exchange, or lease of real estate" needs to have a real estate license . Had GVG made this distinction, the court may have ruled differently because the FCC has already opined that "calls by real estate agents to property owners for the purpose of offering their services to the owner" See 2005 FCC Report, at 3793.   With this ruling, Real estate agents in Texas can circumvent the do not call registry laws by purchasing leads from companies who cold call like GVG.   Texas also may not have the same case law in California dictates that the purchase does not necessarily have to occur with the initial contact as in the case of a call describing a vacation and the offering of a toll free number[47].  Based on the allegations in GVG Texas, it is reasonable to infer that GVG

---

[44] Pepper v. GVG Capital LLC, No. H-22-2912, 2023 U.S. Dist. LEXIS 7394, at *8 (S.D. Tex. Jan. 17, 2023)

[45] The term "agent" is derived from the employment relationship between a broker and salesperson, where the salesperson is the broker's agent.

[46] 2005 Texas Occupations Code CHAPTER 1101. REAL ESTATE BROKERS AND SALESPERSONS §
1101.002. DEFINITIONS. In this chapter: (1) "Broker": (A) means a person who, in exchange for a commission or other valuable consideration or with the expectation of receiving a commission or other valuable consideration, performs for another person one of the following acts (ix) procures or assists in procuring a prospect to effect the sale, exchange, or lease of real estate;

[47] Panacci v. A1 Solar Power, Inc., No. 15-cv-00532-JCS, 2015 U.S. Dist. LEXIS 77294, at *16 (N.D. Cal. June 15, 2015), and Report and Order, 18 FCC Rcd. 14014, 14040 ¶ 142 (F.C.C. July 3, 2013) ("2003 FCC Order")

13

1  intended to find a buyer who would ultimately complete any sale

2

3

4  1) Did DEFENDANTs offer Home Selling Services?

5  AUSSIEKER reasons that the calls were solicitations because the caller sought to offer

6  'home selling services' akin to those offered by real estate agents. Plaintiff says he was

7  solicited to see if he was interested in selling a property[48] Plaintiff alleges that TSHB

8  solicited prospective sellers and would later market the property to prospective buyers[49]. By

9  "marketing" AUSSIEKER pleads TSHB had a bulletin board of "deals" which had a notation

10  that "3 more buyers needed" which indicates that TSHB was looking for buyers[50] . Plaintiff

11  cites another Instagram story that depicted that a property available that would be "delivered

12  vacant" with features such as "projected profit" are marketing remarks[51]. The marketing of

13  properties and searching for buyers are services and AUSSIEKER pleads that DEFENDANT

14  performed services in expectation of compensation because they charged an assignment fee[52].

15  An initial search of the Sacramento county recorders office[53] indicated that TSHB had not

16  recorded any interest in a property and alleged that the buyers that TSHB works with are

17  "others".  PLAINTIFF alleges that PLAINTIFF would pay for DEFNDANTS services in the

18  form of a lower purchase price[54] PLAINTIFF  alleges that the marketing was done in

19  expectation of compensation because TSHB would collect an assignment fee[55].

20

21

22

23

24

---

25  [48] Docket No. 1 at pp.5, ¶30
[49] Docket No. 1 at pp.8, ¶44
26  [50] . Docket No. 1 at pp.8, ¶44
[51] Docket No. 1 at pp.8, ¶43
27  [52] Docket No. 1 at pp.9, ¶47
[53] Docket No. 1 at pp.11, ¶61
28  [54] Docket No. 1 at pp.8, ¶47
[55] Dkt 1. Page 8 ¶43

The projected profit is the attractive carrot dangled in front of an investor to get them to pay the assignment fee. Mr Pineda[56] writes about this strategy in his Step By Step Guide On Wholesaling real estate:

> "I have this property under contract with the seller for $200,000, and I know other buyers would be willing to pay $215,000 I can assign the contract to them for $215,000. So the buyer would then pay $215,000. $200,000 of that would go to the seller and the other $15,000 would go to me, the wholesaler. One thing you're probably wondering is why would the buyer pay me more? Why not just find the seller himself? The reason is that finding the seller is the hardest part of any deal. If the buyer knows they'll pay an assignment fee of $15,000 for this house, and after they fix it up they can make a $40,000 profit, they'll pay that everyday..[57]"

According to Mr. Pineda, the investor will gladly pay the assignment fee because the investor can make a profit even after paying the assignment fee. The wholesaler is compensated in performing the hardest task which is finding the seller. This means that sellers do in fact receive a lower price because the wholesaler needs to get a contract on the property cheap enough to make it attractive to an investor who would be willing to pay the assignment fee in addition to the purchase price. PLANTIFF pleads that TSHB generated a $45,000 assignment fee on a $305,000 transaction[58]. According to Mr. Pineda again, an investor will gladly pay the assignment fee if the investor knows they can sell the property for a profit. Thus the facts support the conclusion that the sellers would pay for DEFENDANTS services through a reduced sales price.

TSHB was acting a real estate agent or a broker which is defined by California Business and Professions Code §10131 as a person who, for a compensation or in expectation of a compensation, regardless of the form or time of payment, does or negotiates to do one or

---

[56] This is the same Ryan Pineda who has been identified as the CEO of Homerun Offer and Allstar Investments. He is an expert in the area of wholesaling because he has flipped hundreds of homes, purchased hundreds of rentals.
[57] https://www.ryanpineda.com/blog/step-by-step-guide-on-wholesaling
[58] Docket No. 1 at pp.18, ¶¶94

15

1   more of the following acts for another or others: sells or offers to sell, buys or offers to buy,

2   solicits prospective sellers or purchasers of, solicits or obtains listings of, or negotiates the

3   purchase, sale or exchange of real property or a business opportunity. Here DEFENDANTS

4   solicited sellers and would negotiate the sale of property through an assignment of contract

5   and thereafter collect an assignment fee. All of the Calls encouraged the purchase

6   DEFENDANTs service of connecting sellers to a buyer and don't appear to be part of an

7   occasional and nonrecurring basis. These acts are part of an ongoing business enterprise

8   because multiple transactions are being conducted and the business name "TOP SHELF

9   HOME BUYERS" is indicative that there is an ongoing effort to be in the business of buying

10   and selling houses.

11

12

13

14     Are calls to turn an illiquid asset into cash a telemarketing call?

15     Should this court follow Anderson v. Catalina Structured Funding, Inc, the calls were

16   solicitations because the calls sought to encourage the purchase of TSHB home buying

17   services. The court in CATALINA found that the calls were a solicitation under the TCPA

18   because the caller was also offering the service of turning a long-term income stream into

19   immediate cash) (citing Buja v. Novation Capital, LLC, No. 15-81002, 2017 WL 10398957,

20   *7 (S.D. Fla. Mar. 31, 2017). TSHB did offer to sell Plaintiff services—their home

21   buying services that the seller would not have to make any repairs, pay any closing costs or

22   pay any Realtor commissions (Dkt 5. Page 11 ¶62). California requires sellers to disclose all

23   natural hazards[59], strap water heaters [60]and ensure that the home has adequate smoke

---

[59] California Civil Code ("Cal.Civ.Code") 1103 through 1103.15, imposes a duty to disclose, on the NHD Statement, if residential property improved with one-to-four units, or a mobile home, that is being sold is in one of six "natural hazard" zones. The six zones are: 1) A flood hazard zone as designated by the Federal Emergency Management Agency; 2) An area of potential flooding after a dam failure(also known as a "dam failure inundation area"); 3) A very high fire hazard severity zone; 4) A wildland fire area (also known as "state fire responsibility area" or "SRA");

detectors and CO2 detectors[61]. These compliance measures and disclosures cost money to a seller[62] in addition to normal expenses associated with selling a property to include real estate commissions and property preparation costs. In the complaint, PLAINTIFF alleges that TSHB would make the home owner pay for these services in the form of a reduced sales price[63]. This could be a conclusionary allegation, but an inference is made that the company would only undertake such efforts in order to make money and thus the seller would be paying for these services. AUSSIEKER submits his declaration that it is commercially unreasonable to contact random home owners who have not indicated any interest in selling if purchasing for value because there is not any advantage to doing so when there are many suitable alternatives on the Multiple Listing Service "MLS"[64]. After AUSSIEKER drafted the motion for default judgement, he learned that the DEFENDANT did purchase a property in Sacramento County. When AUSSIEKER initially searched the Sacramento County Recorders records, he did not see any records of TSHB as a buyer. Subsequent[65], records indicate that on 9/28/2022, TSHB purchased 188 Santiago Ave Sacramento, CA 95815 for 300K[66] and there is not a reference to an MLS number for the sale that occurred on 9/28/2022 which indicates that the property was sold "private party" without exposure to the MLS. The property was immediately listed for sale on 10/6/2022[67] for 350K and later the price was raised to 365K[68] after 15 days. The city did not show any building permits [69] had been taken out and thus it is unlikely that any substantial work was performed to justify the

---

5) An earthquake fault zone; and 6) A seismic hazard zone.
[60] California Code, Health and Safety Code - HSC § 19211 (b)
[61] California Code, Health and Safety Code - HSC § 19211 (b)
[62] Plaintiff dec in support of default judgment ¶12
[63] Docket No. 1 at pp.11-12 ¶63
[64] Plaintiff dec in support of default judgment  ¶14
[65]  Plaintiff dec in support of default judgment  ¶13
[66] https://www.trulia.com/p/ca/sacramento/188-santiago-ave-sacramento-ca-95815--2085803115
[67] Id.
[68] Id.
[69] https://sacramento.agencycounter.com/

17

$50,000 price increase, later up to $65,000 in 8 days.  The facts support the conclusion that sellers who sold to TSHB were paying for DEFENDANTS home buying services through a reduced sales price because it's not possible for DEFENDANTS to pay market value for a property and turn around and sell a property for market value a week later.

Did Defendant use an ATDS?

At this time, the Plaintiff wishes to withdraw his count for violation of Section 227(b)(2)(B) because the current circuit case law has expanded the definition of an auto dialer to now require that the DEFENDANTS dialer dial "Random telephone numbers" and plaintiff pleads that Defendants used skip tracing to acquire plaintiffs number.

ENJOIN

Plaintiff requests that TSHB and NICO be enjoined from violating the TCPA.  There is a future harm because DEFENDANTs have ignored the courts order to respond.  Plaintiff alleges that the DEFENDANTS used " skip tracing" to contact Plaintiff because they were attempting to reach the owner (Aussieker's Spouse) for a property he does not own. DEFENDANT appears to use a scattershot technique where they attempt to call property owners or any phone number connected to a property.  PLAINTIFF and his spouse own other houses and there is no guarantee that the same skip tracing technique will not be utilized in the future.  For this reason, there is clear future harm and DEFENDANTS must be enjoined from making any telephone solicitation calls to 916-705-8006.

18

4.  Sum of Money at Stake

With respect to the fourth factor, "the court must consider the amount of money at stake in relation to the seriousness of DEFENDANT's conduct." BWP Media USA, Inc. v. P3R, LLC, 2014 U.S. Dist. LEXIS 114563, *7 (C.D. Cal. July 3, 2014). DEFENDANT has repeatedly violated the TCPA with respect to Plaintiff. Given DEFENDANT's willful engagement in harassing and unlawful robocalls, and its failure to comply with the judicial process or to participate in the present litigation, imposition of a monetary award is warranted. The $12,000 sought is a very small penalty to pay for DEFENDANT's TCPA violations when comparted to the massive profits that the company appears to make.

5.  Possibility of Dispute Concerning Material Facts

Plaintiff has satisfied the fifth Eitel factor as well, since all well-pleaded facts in the Complaint are to be taken as true upon entry of default. In this case, Plaintiff has filed a well-pleaded complaint alleging the facts necessary to establish his claims, and the Clerk has entered default against the DEFENDANTs[70]. Plaintiff served DEFENDANT NICO after TSHB did not respond nor inform Plaintiff if TSHB had any desire to defend[71]. Consequently, plaintiff will hold both parties responsible for the calls. Aussieker included the dates and the times in which the calls were received in his complaint[72], and included proof that he registered his number on the Do Not Call Registry[73] which leaves no dispute regarding the material averments of the Complaint, and the likelihood that any genuine issue exists is at best, remote.

---

[70] Docket No.5, NO, 8
[71] Plaintiff dec in support of default judgment  Pg 1¶6
[72] Docket No.1 Pg 7 ¶39
[73] Exhibit A, Docket No.1 Pg 20

19

6.   Whether Default was Due to Excusable Neglect

DEFENDANTs have elected to not call back or even email plaintiff regarding the lawsuit[74]. Both parties have been served.     There is nothing much that can be done for a DEFENDANT that refuses to defend himself.   The policy of favoring decision on the merits is outweighed when a DEFENDANT intentionally decides to ignore a lawsuit.  The Summons is a court order to respond. DEFENDANTs get a "free look" at PLAINTIFF's trial strategy and can game the system by responding only after PLAINTIFF has moved for a default judgment. Technology exists like Docketbird that will notify like people who have expressed interest in a case when a new filing is made. Accordingly, its highly unlikely to occur in the present case because the corporate entity and an employee were both served, but if someone comes forward at the last minute there is an appearance that the defaulting party is taking advantage of the opposing party, by choosing to defends the action after seeing PLAINTIFF's trial strategy

7.   Policy Favoring Decision on the Merits

Finally, the mere existence of FRCP 55(b) indicates that the seventh Eitel factor is not alone dispositive. Under FRCP 55(a), termination of a case before hearing the merits is allowed whenever a DEFENDANT fails to defend an action. C.        Damages

Allegations of damages must be proven. See Geddes, 559 F. 2d at 560. "The plaintiff is required to provide evidence of its damages, and the damages sought must not be different in kind or amount from those set forth in the complaint." Amini Innovation Corp. v. KIT Intl. Mktg., 768 F. Supp. 2d 1049, 1054 (C.D. Cal. 2011) (citing Philip Morris USA, Inc. v.

---

[74] Plaintiff dec in support of default judgment Pg 3¶20

Castworld Prods., Inc., 219 F.R.D. 494,498 (C.D. Cal. 2003)). When "proving-up" damages, admissible evidence supporting damage calculations is required. Aussieker attaches a list of the calls he received confirmation that he registered his number on the DNC as Exhibit A. The spoofed number is indicative of DEFENDANTS awareness of wrongdoing plaintiffs claim that the calls were made willfully and knowingly. Each call contains or justifies $1,500 for violating §227(c) by calling a phone number on the Do not call registry.

The Court must address three issues when considering TCPA damages. See, e.g., Heidorn, 2013 U.S. Dist. LEXIS 177166, 2013 WL 6571629 at *15..17;j2 Global Commc'ns, 2009 U.S. Dist. LEXIS 111609, 2009 WL 4572726 at *7- 8; Roylance v. ALG Real Estate Services, Inc., No. 5:14-cv-02445-PSG, 2015 U.S. Dist. LEXIS 44930, 2015 WL 1522244 (N.D. Cal. March 16, 2015) adopted as modified by No. 14-cv-02445-BLF, 2015 U.S. Dist. LEXIS 44933, 2015 WL 1544229 (N.D. Cal. April 3, 2015). First, the Court must determine the number of TCPA violations the Plaintiff has established, see Heidorn, 2013 U.S. Dist. LEXIS 177166, 2013 WL 6571629 at *15; Roylance, 2015 U.S. Dist. LEXIS 44930, 2015 WL 1522244 at *9. Here, Aussieker compiled a chart[75] in his complaint showing 6 calls were initiated that resulted in 6 violations under § 227(c). Aussieker establishes the violations, and is asking for punitive damages in addition to the violations. Charvat v. NMP, LLC (2001, CA6 Ohio) 656 F.3d 440 holds that a party may recover statutory damages under both the automated-call subsection of the TCPA, 47 U.S.C. § 227(b), and the do-not-call-list subsection, 47 U.S.C. § 227(c) (as implemented in 47 C.F.R. § 64.1200(d)). Aussieker establishes that all calls[76] were made in violation 47 U.S.C. § 227(c) (as implemented in 47 C.F.R. § 64.1200(c)) because he attaches evidence that his

---

[75] Docket No. 1 at pp7, ¶39
[76] Ibid

21

number was on the Do not call registry during the relevant time (Aussieker registered 916-705-8906 in February 2003 —at least 31 days prior to the offending calls)[77]. Aussieker establishes that the calls were for the purpose of telephone solicitation because the calls sought to encourage the purchase of DEFENDANTs services. The DEFENDANTS were acting like real estate agents[78] and the FCC has opined that the calls by agents are solicitations[79]. Aussieker also pleads that the calls were to promote the purchase of DEFENDANTs service of connecting buyer and sellers whereby seller would wholesale the contract which is when the buyer would purchase the property and pay an assignment fee to DEFEENDANT[80]. This would result with the seller paying for the Defendants services through a reduced sales price. PLAINTIFF attaches proof to this claim by showing that the DEFENDANTS had collected a $45,000 assignment fee[81] according to a story posted on Abels Instagram page. The fee that was paid to DEFENDANTs exceeded the amount that Bankruptcy Judges in this District had typically approved as real estate agents as commissions[82]. Mr Pineda has published a guide on wholesaling on the internet that illustrates the eagerness of an investor will pay an assignment fee if a profit can still be realized. Alternatively, Plaintiff pleads that DEFENDANTs sought to promote their home rescue repair business where they would they would provide a liquidity service to convert an asset into cash whereby Sellers would pay for customary costs like repairs, commission, statutory requirements through a reduced sales price.

---

[77] Exhibit A
[78] Docket No. 1 at pp9, ¶46, ¶47
[79] "a telephone solicitation would include calls by real estate agents to property owners for the purpose of offering their services to the owner, whether the property listing has lapsed or not." In the Matter of Rules & Regs. Implementing the Tel. Consumer Prot. Act of 1991, 20 F.C.C. Rcd. 3788, 3793 ("2005 FCC Report")
[80] Docket No. 1 at pp9, ¶47
[81] Docket No. 1 at pp18, ¶94
[82] Docket No. 1 at pp18, ¶94

Case 2:22-cv-01886-DAD-CKD   Document 11   Filed 05/25/23   Page 23 of 43

Aussieker establishes that all calls[83] were made in violation 47 U.S.C. § 227(c) (as implemented in 47 C.F.R. § 64.1200(d)) because DEFENDANTS failed to comply with the procedural requirements of the TCPA. Namely:

> Section 64.1200(d) requires that telemarketers must maintain their own, internal do-not-call lists, and subsection (d)(3) requires that "[i]f a person or entity making a call for telemarketing purposes (or on whose behalf such a call is made) receives a request from a residential telephone subscriber not to receive calls from that person or entity, the person or entity must record the request and place the subscriber's name, if provided, and telephone number on the do-not-call list at the time the request is made." 47 C.F.R. § 64.1200(d)(3). Subsection (d) also sets forth certain requirements in connection with maintaining seller-specific do-no-call lists, including the requirements that: 1) "[a] person or entity making a call for telemarketing purposes must provide the called party with the name of the individual caller, the name of the person or entity on whose behalf the call is being made, and a telephone number or address at which the person or entity may be contacted;" and 2) "Persons or entities making calls for telemarketing purposes must have a written policy, available upon demand, for maintaining a do-not-call list." 47 C.F.R. § 64.1200(d)(5).[84]

Here, Plaintiff complains that the he requested copies of DEFENDANTS internal do not call policy and it was never provided[85]. PLAINIFF requested to not be called[86] and he was called again on 6/7/2022[87]. During that call on the 7th, the caller did not reveal the name, even though the caller had asked for MATT which was a code name only supplied to NICO[88]. Therefore, the DEFEDANTS failed to maintain an internal do not call polcy, list or adhere to the procedural requirements of the TCPA.

Aussieker establishes that NICO CONTRERAS participated in the phone calls[89] because he NICO texted AUSSIEKER a photo of his business card to AUSSIEKER so AUSSIKER would

---

[83] Ibid

[84] *Heidorn v. BDD Mktg. & Mgmt. Co.*, Case No. C-13-00229 JCS, 16-17 (N.D. Cal. Aug. 19, 2013)

[85] Docket No. 1 at pp18, ¶94 and pp6, ¶32 (see also Plaintiff dec in support of default judgment Pg 1¶5)

[86] Docket No. 1 at pp6, ¶32

[87] Docket No. 1 at pp6, ¶32

[88] Docket No. 1 at pp6, ¶34

[89] Docket No. 5 at pp.8, ¶¶18

know who called him and how to make contact with NICO again  The TCPA is part of the Communications Act of 1934, as amended, and the Communications Act contains a respondeat superior provision. See 47 U.S.C. § 217, "the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person." This provision applies when "construing and enforcing the provisions of the Communications Act." Reynolds Corp. v. National Operator Services, Inc., 73 F. Supp. 2d 299, 305 (W.D.N.Y. 1999).   Under this principle, both parties are jointly and severally liable.

1.

Plaintiff is Entitled to Damages Under the TCPA

Plaintiff shows that DEFENDANTS, both jointly and severally violated both 47 C.F.R. §64.1200(c) and §64.1200(d) Plaintiff seeks $3,000 in damages. The award of (6) statutory penalties of $500 for a total of $3,000.  The TCPA allowed for damages up to $500 when it became law in 1991 [90]. Since that time, the civil damages have not been adjusted for inflation making the penalty today the equivalent of $225.96[91] in 1991 after adjusting for inflation. On the other hand, the FCC adjusts the forfeiture penalties for inflation, in accordance with the Federal Civil Penalties Inflation Adjustment Act[92].  There is no justification for Defendant's failure to adhere to the requirements of the TCPA.  PLAINTIFF has taken steps to avoid unwanted solicitations by registering his number on the do not call registry.  The nature of defendants act was to pitch him home selling services after DEFENDANTS obtained a phone

---

[90] Public Law 102-243
[91] https://www.bls.gov/data/inflation_calculator.htm   April 1991- January 2023.
[92] Amendment of Section 1.80(b) of the Commission's Rules, Adjustment of Civil Monetary Penalties to Reflect Inflation, Order, 33 FCC Rcd 12278, 12283 (EB 2018) (2019 Inflation Order).

1  number that was supposedly connected to the owner of a property that PLAINTIFF had no

2  interest in.  The calls were ultimately marketing plan that involved scattershot phone calls

3  made to every phone number believed to belong to a property owner.

4

5  <u>Plaintiff is Entitled to an Enhancement of Damages</u>

6  Plaintiff requests the court triple this amount by finding the DEFENDANT willfully or

7  knowingly violated the TCPA regulations.  There is a split in authority as to what predicate

8  conduct is required before a treble damages award may be issued[93].  Some courts require that

9  the PLAINTIFF show that the defendant is either so large that an award of statutory damages

10  would be trivial or show that DEFENDANTS  has been sued before under the TCPA[94].  This

11  requirement fails to consider the evasive efforts that DEFENDANTS have taken to disguise

12  their identity.  Such requirements further incentivize violators to take evasive actions from

13  being identified. With the mask mandates, there was a "Boon" in criminal activity when

14  criminals could easily blend in and avoid detection[95].  In criminal cases, wearing a disguise and

15  attempting to evade police, indicated that the defendant knew "what was going on." [96] The

16  same is true for telemarketers who spoof the caller id.  Plaintiff asks the court to rule that

17  taking any sort of evasive action to avoid detection be the predicate conduct that is required

18  before treble damages may be issued.

19

20      The damages requested appear to be trivial compared to the $45,000 assignment fee[97]

21  that was collected on one occasion, and the other fees  that were reported to have been made[98].

22  Plaintiff asks the court to rule that the DEFENDANTS made  predicate conduct that is required

---

[93] *Trindale*, 2014 WL 3572132, at *5 n. 59 (citing *J2 Global Commc'ns, Inc. v. Blue Jay Inc.*, Case No. 4:08-cv-4254-PJH, 2009 WL 4572726, at *7 (N.D. Cal. Dec. 1, 2009)
[94] *Heidorn v. BDD Mktg. & Mgmt. Co.*, Case No. C-13-00229 JCS, 27 (N.D. Cal. Aug. 19, 2013
[95] https://news.wttw.com/2020/05/16/coronavirus-masks-boon-crooks-who-hide-their-faces
[96] *U.S. v. Sewell*, 252 F.3d 647 (2d Cir. 2001).
[97] Id 82
[98] Docket No. 1 at pp.8, ¶43

before treble damages may be issued.  How the DEFENDANTS made this money should not be factored into whether or not the amount is trivial, but is analyzed later in the application.

Other courts have found ""[i]ntent to do a wrongful act is not an essential element of willfulness" and that the FCC interprets willfulness to mean "simply that the act of which a violation arises was not an accident or mistake, even if the resulting violation was unintended"[99] Plaintiff has provided evidence to show the act was intentional because they sought out to contact (by telephone) a phone number that was believed to be associated with the owner of 5803 59th st when they asked for Kimberly[100]. 5803 59th st Sacramento was purchased by Kimberly Moir on 9/28/2001 [101]. The owner of the property Kimberly Aussieker f/k/a Kimberly Moir, but never re-titled the property after she was married on 5/18/2008.   The phone number was obtained by "skip tracing" and thus it was an intentional act[102] .  A person need not have intent to commit an unlawful act in order to act willfully or knowingly under the TCPA."[103]

Plaintiff is Entitled to Punitive damages under Cal. Civ. Code § 3294

The purpose for awarding punitive damages is to punish wrongdoing and protect the public from future misconduct, either by the same DEFENDANT or other potential wrongdoers. Damages are warranted under Cal. Civ. Code § 3294 which provides: In an action for the breach of an obligation not arising from contract, where it is proven by clear and convincing evidence that the DEFENDANT has been guilty of oppression, fraud, or malice, the plaintiff, in addition to the actual damages, may recover damages for the sake of example and by way of

[99] *Roylance v. Alg Real Estate Services, Inc.*, Case No. 5:14-cv-02445-PSG, 21 (N.D. Cal. Mar. 16, 2015
[100] Docket No. 1 at pp.5, ¶30
[101] See Book 20010928 page 1721 on file with Sacramento County Recorders office.
[102] Docket No. 1 at pp.5, ¶28
[103] Roylance v. ALG Real Estate Servs., Inc., 2015 WL 1522244, at *10 (N.D. Cal. March 16, 2015).

1   punishing the DEFENDANT.

2       Here there was a breach of an obligation not arising from a contract when the

3   DEFENDANTs knowingly transmitted misleading or inaccurate <u>caller identification</u>

4   <u>information</u> because the PLAINTIFF  dialed the number that NICO called from[104] and found it

5   to be non working[105] and there is an inference that DEFENDANT NICO knew it was non

6   working number when he texted PLAINTIFF  his business card from a different number which

7   was working[106]. This obligation to transmit proper caller id is codified under 47 U.S.C. §227(e)

8   provides:

9

10  **(1)IN GENERAL**

11  It shall be unlawful for any <u>person</u> within the <u>United States</u>, or any <u>person</u> outside the <u>United</u>
    <u>States</u> if the recipient is within the <u>United States</u>, in connection with any <u>voice service</u> or <u>text</u>

12  <u>messaging service</u>, to cause any <u>caller identification service</u> to knowingly transmit misleading or
    inaccurate <u>caller identification information</u> with the intent to defraud, cause harm, or wrongfully

13  obtain anything of value, unless such transmission is exempted pursuant to paragraph (3)(B).

14  When information regarding the origination of a phone number is found to be inaccurate, it is

15  known as "spoofing".  The above statue requires that the act be done with the intent to defraud ,

16  cause harm, or wrongfully obtain anything of value.  The Federal Trade Commission has

17  previously found that the avoidance of culpability, whether involving government enforcement

18  actions or private lawsuits, is a benefit that qualifies as a thing of value, one with an

19

20  ascertainable dollar value[107].  The act was intentional because the ability to transmit a caller ID

21  that is not that of the caller or the party on whose behalf the call was made, requires  purposeful

22  sequence of events to purchase, install, configure and use of specialized computer applications

23  that permit the caller to transmit the caller ID of choice.  This set of events requires purposeful

24  actions, "To do something purposeful and not accidently is willful".   DEFENDANT TSHB is

25

26

27  [104] Docket No. 1 at pp.7  ¶¶38
    [105] Plaintiff dec in support of default judgment  ¶16

28  [106] Docket No. 1 at pp.6  ¶¶31
    [107] Roesel Forfeiture Order, 33 FCC Rcd at 9212, para. 22; Roesel Notice, 32 FCC Rcd at 6413, para 27 AND

a limited liability company. "A limited liability company is a hybrid business entity formed under the Corporations Code[108].  The obligation to transmit accurate caller id is found under the TCPA and Under the TCPA, "the act, omission, or failure of any officer, agent, or other person acting for or employed by any common carrier or user, acting within the scope of his employment, shall in every case be also deemed to be the act, omission, or failure of such carrier or user as well as that of the person." 47 U.S.C. § 217[109].  PLAINTIFF alleges that all times NICO CONTRERAS  was employed by TSHB LLC,  and each and every call was placed on behalf of the corporate entity headed by its Member Manager[110]. Plaintiff pleads NICO knew to supply PLAINTIFF with a "Real phone number" since NICO knew that the outgoing numbers displayed on caller id were non working.  NICO's knowledge of the non working caller id is imputed DEFENDANT TSHB. The failure to comply with 47 U.S.C. §227(e), is NICO's failure because he appeared to know about the caller-id spoofing.  The failure is also DEFENDANT TSHB because the corporate defendant either knew or should have known of the spoofed caller id. A company can't initiate a call on its own therefore a person acting for or employed by DEFENDANT TSHB set in motion a purposeful sequence of events to purchase, install, configure for use the specialized computer applications that permitted them to transmit the caller ID of their choice which was not a number that that a person could call to request placement on the DEFENDANTS company-specific do not-call list as required by law[111].  DEFENDANT TSHB, senior-most executive, Mr. Torres had the power to fire the managers, affiliates, agents, and employees (if any) taking part of the day-to-day operations of these

---

[108] Witkin, Summary of California Law (2005) Partnership, § 136, p. 697

[109] Sapan v. Home Star Capital, Inc., No. SACV 15-01989-CJC(KESx), 2016 U.S. Dist. LEXIS 144381, at *11-12 (C.D. Cal. Oct. 17, 2016)

[110] Docket No. 1 at pp.13  50¶69
[111] See Rules and Regulations Implementing the Truth in Caller ID Act of 2009, Report and Order, 26 FCC Rcd 9114,
9128, para. 36 (2011) (Truth in Caller ID Order); see also 47 CFR § 64.1601(e).

illegal calling operations.  Mr. Torres made admissions that he was aware that the company engaged in telephone calls because he emailed plaintiff and said "Although We do thoroughly scrub the lists however, regretfully this one may have slipped through[112]"  Mr. Torres did not seek to blame NICO  or any rogue actor for the call, rather he attributed the call to on the company[113] end that PLAINTIFF questions the veracity of this claim[114].  Knowledge of cold calling would have required Mr. Torres to investigate or hire people to make a minimum investigation to ensure compliance with 64.1200(d). Such an investigation would have revealed that the company did not have an internal do not call policy and that the company was using out of compliance with  47 U.S.C. §227(e).  The failure of any aspect under the TCPA is also the failure of the company and thus the requirements of Cal. Civ. Code § 3294(b) do not apply.

"In order to determine whether punitive damages should be awarded, the [c]ourt considers: (1) the nature of DEFENDANT's acts; (2) the amount of compensatory damages awarded; and (3) the wealth of the DEFENDANT." Here, PLAINTIFF seeks punitive damages for the DEFENANDANT's intentional act of transmitting inaccurate caller id to obtain anything of value.  Compensatory damages have not been requested.  In addition, PLAINTIFF must show that the DEFENDANT acted with fraud, malice or oppression.  Legal malice merely means the wrongful intention to do harm which the law always presumes as accompanying a wrongful act, without any proof of malice in fact[115]..  Here, DEFENDANTS set in motion a purposeful sequence of events to purchase, install, configure for use the specialized computer applications that permitted them to transmit the caller ID of their choice which was not a number that that a person could call to request placement on the

---

[112] Docket No. 1 at pp.10  ¶50
[113] ibid
[114] Plaintiff dec in support of default judgment  pg 2  ¶18
[115] Morgan v. French (Cal. App. 1945), 70 Cal. App. 2d 785, 161 P.2d 800, 1945 Cal. App. LEXIS 1135

29

DEFENDANTS company-specific do not-call list as required by law[116].  The act is illegal because the DEENDANTS are required to transmit accurate caller id and DEFENDANTS did so intentionally because the ability to transmit a caller ID that is not that of the caller or the party on whose behalf the call was made, requires  purposeful sequence of events to purchase, install, configure and use of specialized computer applications that permit the caller to transmit the caller ID of choice, therefore acted with legal malice.  In addition,  "Fraud" means an intentional misrepresentation, deceit, or concealment of a material fact known to the DEFENDANT with the intention on the part of the DEFENDANT of thereby depriving a person of property or legal rights or otherwise causing injury. The misdirection DEFENDANTS created by using misleading or inaccurate caller ID numbers allowed DEFENDANTS to also hide from potential civil actions brought by aggrieved individuals, increase sales or increase the frequency of calls without alerting prospective customers because each time they called, a new number would appear in the recipients call history.  The Federal Communication Commission has found the requisite intent to harm where a company masks its actual phone number by using unassigned numbers or numbers belonging to completely unrelated third parties[117]. The caller id was spoofed because PLAINTIFF tried calling the number back and found the number to be non working[118] and NICO texted (from a different) phone number  NICO's "real" phone number[119].   The use of one phone which was found to be non working and subsequent calls from a different number is indicative that the DEFENDANTS used a spoofed caller id.

---

[116] See Rules and Regulations Implementing the Truth in Caller ID Act of 2009, Report and Order, 26 FCC Rcd 9114, 9128, para. 36 (2011) (Truth in Caller ID Order); see also 47 CFR § 64.1601(e).

[117] See Abramovich Forfeiture Order, 33 FCC Rcd 4663, 4668, para. 18.; Roesel Forfeiture Order, 33 FCC Rcd at 9217, para. 37 & n.92

[118] Docket No. 1 at pp.7, ¶38

[119] Docket No. 1 at pp.13, ¶71

Plaintiff has a cell phone that has call blocking technology where a number can be saved and future calls will be rejected[120]. Most spam and robocalls are made using random phone numbers[121]. DEFENDANTS used a spoofed caller id which negates a consumer from utilizing call blocking tools to mitigate their harm.

Plaintiff also notes an out of circuit decision to not award damages when a caller spoofed the caller id. The plaintiff in that case (Mr. Strange sought damages for the violations of Louisiana's Caller ID Anti-Spoofing Act of 2009, La. Stat. Ann. §§ 51:1741.1, et seq . Mr. Strange relied on a recent FCC decision for the proposition that "Caller ID spoofing causes actual damages that can be measured. That decision, as quoted by Strange, provides that the use of spoofing allowed the defendant to "hide from potential civil actions" and that "the avoidance of culpability . . . is a benefit that qualifies as a thing of value—one with an ascertainable dollar value." The plaintiff in that case (Mr Strange) offered no proof that the Defendant (Mrs Davis) was able to hide from or avoid culpability due to the use of spoofing because her "appearance as a Defendant in the lawsuit indicates that (Mr. Strange) was able to identify her and seek recovery against her" [122].

Plaintiff notes a few nuances the court should be made aware of before using this case as precedent. First, the Louisiana statue is slightly different than 47 U.S.C. §227(e) because the Louisiana statue reads "wrongfully obtained anything of value from... the <u>recipient of a telephone call</u>" [123].The Federal Statue does not require that the thing of value be obtained from the from <u>recipient of a telephone call.</u> Obviously if the legislature intended to require whom the value must be obtained from, it would have worded the statue accordingly. Second, the

---

[120] https://www.androidpolice.com/how-to-block-spam-calls-android/
[121] ibid
[122] Strange v. Davis, No. 2:19-cv-02494-MSN-atc, 2023 U.S. Dist. LEXIS 41501, at *14 (W.D. Tenn. Feb. 17, 2023)
[123] Strange sued under Louisiana's Anti-Spoofing 2009, La. Stat. Ann. §§ 51:1741.1, et seq which makes it illegal to "wrongfully obtain anything of value from, mislead, defraud, or deceive the recipient of a telephone call.

31

Louisiana court appeared to require a "tangible" thing of value. The phrase 'thing of value' is generally construed to cover intangibles as well as tangibles.[124]   A district court properly construed the meaning of the term "anything of value" to "focus on the value that the defendants subjectively attached to the items.[125]   *Thing of value* has been applied to commercially worthless stock which a defendant "believed" had value for himself[126].  Mr. Strange did not make any reference to the idea Mrs. Davis received  an intangible benefit[127]. Curiously, the court was not interested in the circumstances in which the caller had identified herself.  At some point, the anonymous caller has to reveal themselves in order to effect a sale.

PLAINTIFF submits his declaration that he infers that DEFNEDANTS believed they were hiding from or avoiding culpability by using spoofed numbers[128]    The DEFENDANTS were named in a lawsuit because they volunteered their identity and not because PLAINTIFF was able to figure out the entity behind the spoofed caller id.  A telemarketer who spoofs the caller id is in absolute control over who gets to know their real identity. DEFENDANTS probably had a pattern or practice of "Feeling out" the person  and if the caller did not feel threatened they would reveal their identity. There is an intangible value in hiding from or avoiding culpability. A telemarketer would have peace of mind knowing that there is little to no chance of being caught if the callee does not know the company behind the call. There is a conscious decision at one point for the telemarketer to reveal their identity.  There is precedent that amusement[129] is something of value and so should the peace of mind knowing that there is little to no chance of being caught when a callee is forced to rely on the entity making  the call to

[124] agreeing with and applying 5th Circuit's expansive interpretation of phrase "anything of value" in Picquet); United States v. Schwartz, 785 F.2d 673, 680 (9th Cir. 1986)
[125] United States v. Williams, 705 F.2d 603, 622-23 (2nd Cir. 1983
[126] ibid
[127] Consistent with courts' interpretation of "anything of value" in other contexts, we found that "anything of value" includes tangible as well as intangible asset NAL, 32 FCC Rcd at 6412-13, paras. 24, 26-27
[128] Plaintiff dec in support of default judgment ¶21
[129] *United States v. Girard,* 601 F.2d 69 (2d Cir.), *cert. denied,* 444 U.S. 871, 100 S.Ct. 148, 62 L.Ed.2d 96 (1979),

1    identify themselves..

2        Plaintiff submits his declaration that DEFENDANTS got his phone number by

3
4    "Skiptracing" a property address and got phone numbers associated with the address[130]. When

5    a working phone number is returned to the correct party, it is called a "match". The

6    DEFENDANTS seek to speak to the property owners and consequently do not know who will

7    answer the skip traced number because a match rate of above 70% in the cold-calling industry

8    is considered a very high quality list.[131]  Plaintiff is proof it is not a perfect science because the

9    caller asked for his wife about a property he did not own.   PLAINTIFF alleged the use of a

10   predictive dialer[132].

11

12   A predictive dialer works autonomously until a human voice comes on the line[133]. If that

13   happens, ideally the telemarketer will join the call. However, a predictive dialer also leads to

14   many abandoned calls because the dialer dials automatically and the software programs are set

15   up in order to minimize the amount of downtime for a telemarketer[134]. If an agent is not free to

16   take the call, the dialer will disconnect the call even though the party has answered. THE FCC

17   has found that predictive dialers are responsible for the vast majority of abandoned

18   telemarketing calls – both hang-ups and 'dead air' calls[135].   DEFENDANTS were able to

19   benefit from using spoofed caller id because they could use a predictive dialer without alerting

20
21   a party that they had previously called.

22       DEFENDANTS being able to make repeated calls and avoid detection would result in

23

---

24   [130] Plaintiff dec in support of default judgment ¶19
25   [131] https://www.propertyradar.com/blog/7-things-to-know-about-real-estate-skip-tracing
     [132] Docket No. 1 at pp.10, ¶49
26   [133] *See Soppet v. Enhanced Recovery Co., LLC,* 679 F.3d 637, 638-38 (7th Cir. 2012); *see also 2003 TCPA Order* at
     14091-93
27   [134] In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-
     278, 18 FCC Rcd. 14014 at footnote 31.
28   [135] In re Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991, CG Docket No. 02-
     278, 18 FCC Rcd. 14014 at ¶ 1471

either 1) speaking with the owner 2) removing wrong numbers. These outcomes both result in gaining something of value because the DEFENDANTS could stop making calls to a number once they determine that the owner is not interested in selling or that the number does not reach the owner of the property.  A penny saved is a penny earned and the end result is that the DEFENDANTS are able to save money by not spending additional money going to non matched or uninterested sellers.  Some real estate wholesale gurus advocate the importance in removing uninterested sellers from your lists because one can substantially reduce postage costs.

DEFENDANTS benefited by making a second sales pitch on 6/7/22 of their services after the initial phone call from a new area code and phone number. The caller asked for MATT. PLAINTIFF asked the caller what the call was about and the caller said he was calling to see if he wanted to sell 5803 59th st[136].  PLAINTIFF asked the caller if he was associated with Nico but the caller denied the accusation and claimed that he was just calling people to see if they were interested in selling. MATT was  the name given to NICO so plaintiff could subsequently trace any callers[137].  The caller unknowingly found himself in a canary trap when he said did not know NICO or TSHB[138].   The caller treated the call as if it was another sales opportunity which is something of value for a company.  DEFENDANTS believed they would able to avoid detection by using the spoofed caller id and pretend to new because they denied any connection to being associated with TSHB or NICO. Its not plausible that the company would simply hand off the lead because Mr. Pineda says that finding sellers is the hardest part[139].  It is not plausible that it was a happenstance occurrence to ask for MATT and  see if MATT wanted to sell 5803 59th st (which he did not own).

---

[136] Docket No. 1 at pp.5-6, ¶30
[137] Docket No. 1 at pp.5-6, ¶30
[138] Docket No. 1 at pp.6, ¶34
[139] https://www.ryanpineda.com/blog/step-by-step-guide-on-wholesaling

DEFENDANTS believed they had gained another sales opportunity and also believed they could hide their identity by using the spoofed caller id. According to precedent the court should "focus on the value that the defendants subjectively attached to the items.[140]

NICO also called the next day on 6/8/22 and said that he thought the "do not call" request was a "mistake" and suggested that PLAINTIFF stop wasting his time and just tell him that he was not interested[141]. Its plausible that the call on 6/7/22 was an underhanded attempt to verify if the do not call request that NICO received was real.    Accordingly, the covert attempt is only possible by using spoofed caller id because it relies on the premise that a new company is calling that has never been told to stop calling.  Making a solicitation after being told to stop and pretending like the company has never received a do not call request is something of value which DEFENDANTS wrongfully obtained  by using spoofed caller id.


NICO instructs plaintiff that he should have… but the reality is that he did ask to stop call and the not only did the calls continue, but it appeared that the call on 6/7/22 did not have any perceptible dead air or delay like the calls made on 6/2/2023 or 6/3/2022, as if the call was placed manually[142]. This indicates that the company benefited from earlier calls in determining that a certain number was working and would later devote more resources to reach "working" or "good" phone numbers.  In industry terms, the prospect is placed on a "high touch" list and the agent would use a "preview dialer[143]" which gives agents time to prepare for the conversation and personalize the message  instead of using a predictive dialer to eliminate the

---

[140] United States v. Williams, 705 F.2d 603, 622-23 (2nd Cir. 1983
[141] Docket No. 1 at pp.7, ¶36
[142] Docket No. 1 at pp.5, ¶29, ¶30
[143] https://convolo.ai/blog/best-auto-dialer-for-cold-calling-sales

problems of a predictive dialer[144]. It appears that DEFENDANTS benefitted from earlier use of spoofed caller id because the additional contact is only possible if the DEFENDANTS never give out the true phone number.

PLAINTIFF shows the wealth of the DEFENDANT, by including a reference that the company collected a $45,000 assignment fee[145] or about 12% of the purchase price when the Bankruptcy Judges in this district typically employs real estate brokers between 5-6%[146]. PLAINTIF believes that 5%-6% is typical for the area with Judge Sargis approving a 6% commission in the sale of real property[147] The fee was likely made through telemarketing because PLAINTIFF submits his declaration that he did not see any mailers or post cards from DEFENDANTS prior to receiving the calls [148] which serves the basis that the initial contact to each customer was done through telephone. Mr. Pineda advises that "If you can't spend a ton of money on marketing you need to stick to some cheap methods. The best for those are cold calling and texting."[149] Mr. Torres's statement that he was aware of the telemarketing campaign[150] and all the Instagram stories that ABLE posted[151] where he reveals that the company does in fact cold call form a reasonable basis to believe that the DEFENDANTS did in fact profit from the illicit calls. The fees that DEFENDANT collected is substantially higher than the amount a typical real estate agent charges. Plaintiff merely requests punitive damages that would punish and deter the DEFENDANTs from violating the obligation to transmit accurate caller id. Given that the motivation to falsify the caller id is presumably to hide from

---

[144] Ibid – predictive dialers also result in abandoned calls or dropped connections if the algorithm does not accurately predict when agents will become available. Agents only speak to callers *after* the callee has answered the phone and do not initially know who is on the other line of the call.
[145] Docket No. 1 at pp.18, ¶¶94
[146] (HUSTED V. GILBREATH 18-20964-E-7 #196 10/13/22
[147] ibid
[148] Plaintiff dec in support of default judgment ¶22
[149] https://www.ryanpineda.com/blog/step-by-step-guide-on-wholesaling
[150] Docket No. 1 at pp.10, ¶50
[151] Docket No. 1 at pp.8, ¶42 , 43, 46

potential civil actions which would carry a liability of $500-$1500 a call, it is reasonable that

this same amount would be sufficient in to deter their illicit conduct. Accordingly, PLAINTIFF

requests $3,000 in punitive damages for the two calls that he received which transmitted non-

working numbers in order to deter wrongful conduct, not to leave the DEFENDANT

financially ruined.   This amount would also serve the legislative intent to deter  by example the

scofflaws who also wrongfully obtain anything of value by transmitting non-working caller id.

ITEMAZATION OF DAMAGES

1.      $500 is sought for each call made. Plaintiff itemizes 6 violations of §227(c)

based on 6 calls that were to encourage the purchase of DEFENDANTS  real estate

wholesale services[152] to a phone number on the do not call registry [153]. The statutory

damages set forth in 47 U.S.C. §227(c)(5)(B) is  up to $500 violation per violation.

2.      Plaintiff requests that the amount in the preceding paragraph be tripled pursuant

to 47 U.S.C. §227(c)(5)(C)[154] . If the court finds that the DEFENDANT willfully or

knowingly violated the regulations prescribed under this subsection, the court may, in its

discretion, increase the amount of the award to an amount equal to not more than 3 times

the amount available under subparagraph (B) of this paragraph

3.      Plaintiff requests Punitive damages under Cal. Civ. Code § 3294$ in the amount

of $3,000

Plaintiff is entitled to costs of his suit.

Plaintiff seeks $400 for his filing fee, $65 to serve TSHB and $75 to serve NICO for a total

of $540.[155]

---

[152] Docket No. 1 at pp.9, ¶¶47
[153] **Exhibit A**
[154] See Complaint, Docket No. 1, page 4 ¶ 22
[155] Plaintiff dec in support of default judgment ¶21

V.   CONCLUSION

Based upon the foregoing, Plaintiff respectfully requests that this Court enter default judgment in the amount of $9,000 against TSHB LLC and NICO CONTRERAS, plus $400 for the filing fee and $65 for serving TSHB and $75 for serving NICO CONTRERAS . Plaintiff would also like prejudgment interest at the legal maximum from the date that this action was initiated.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 24th day of May 2023 in Sacramento, CA. Mark Aussieker

38

1　Mark Aussieker
2　8830 Olive Ranch Lane
　　Fair Oaks, CA 95628
3　Phone: 916-705-8006
4　aussieker1@gmail.com
5　*in pro per*

6

7

8　　　　　　　　　　UNITED STATES DISTRICT COURT

9　　　　　　　　　EASTERN DISTRICT OF CALIFORNIA

10

11　Mark Aussieker,　　　　　　　　　| No. 2:22-cv-01886 -DAD-CKD

12　　　　　　　　Plaintiff,　　　　　| **DECLARATION OF MARK AUSSIEKER IN**
　　　　　　　　　　　　　　　　　　　| **SUPPORT MOTION FOR ENTRY OF**
13　　　　　v.　　　　　　　　　　　　| **DEFAULT JUDDGMENT AGAINST TSHB**
14　　　　　　　TSHB LLC and NICO　　| **LLC and NICO CONTRERAS**
　　　　　　　　CONTRERAS,
15　　　　　　　DEFENDANT.

16

17
　　I, MARK AUSSIEKER, declare as follows:
18

19　1.　　I am the plaintiff and I submit this Declaration in support of Plaintiff's request for entry

20　　　　of Default judgment.

21
　　2.　　I am personally knowledgeable of the matters set forth in this Declaration and, if called
22
　　　　　upon to do so, I could and would competently testify to the facts therein.
23

24　3.　　I filed this complaint on 10/21/2022 (Docket No 1)

25　4.　　DEFENDANT TSHB LLC was served on 11/2/22 as evidenced by the Proof of Service

26　　　　filed in this case. (Docket No 5). Service was complete because ABLE is an executive
27
　　　　　in the company and his knowledge of the suit would definitely be given to the member
28

　　　　　　　　　　　　　　　　　　39

1  manager. Able said he was "Director of Acquisitions"

2  5.   I emailed Alexander Torres who is listed as the member manager for TSHB LLC with

3  the CA secretary of state  on 11/4/22 informing him that service was made and an

4

5  answer was due in 21 days. Mr. Torres did not write back. The email was sent on a

6  previous thread that Mr Torres had communicated to me, so I know it was a working

7  email. In addition, the message did not bounce back.  I also emailed a copy of my

8  complaint advising that NICO had ignored my request for the company internal do not

9  call policy. No internal do not call policy was supplied.

10

11  6.   DEFENDANT did not answer and I requested a default because I did not hear from

12  TSHB that they would be filing a response. The default was entered on 12/2/2022

13  (Docket No 7).

14  7.   NICO CONTRERAS, is an individual, not incompetent or an active duty service

15  member. PLAINTIFF checked with https://scra.dmdc.osd.mil

16

17  8.   I received 3 calls on the day that Nico's answer was due. The number of calls was due

18  the 1st two  calls being "dropped from poor reception. The calls came from a 209 area

19  code which corresponds to NICO's location.  On the 3rd call, the caller mentioned that

20  he would file a "cross complaint" for fraud because I tricked him into revealing his

21  identity by pretending to be interested.  I found the statement curious because the caller

22  never revealed himself. The call went someone casually asking for my wife and then

23  asking if I was interested in selling to threats of a cross complaint for fraud. A cross

24  complaint is a specific action filed after one has been sued and I had not been active in

25  pursuing any TCPA claims since the ATDS ruling. TSHB and NICO were the only

26  people I served a summons on in at least 6 months. There. I also was not able to

28

40

positively identify the caller.  The call came from 209-876-7249 which is the same

carrier that was used to initiate the call on 6/3/22.   All I have is three coincidences, a

call on the day the answer is due, from the same area code using the same carrier as the

call on 6/3/22.  It still why I believe it was NICO.

9.    I searched 209-299-4184, 209-299-4184 - using https://freecarrierlookup.com/ which

reported that the carrier for the caller id displayed was Sinch.

10.   In one of the instagram videos, ABLE records himself making cold calls and identifies

himself as being "Able, Able your neighbor" and telling the callee that he is the

neighbor from down the street.  In the video where they are driving around to an

appointment, ABLE adds the text "18 year old making 5 figure a month" and that he is

killing it, and getting NICO where to state that the money is at the follow up.

11.   I spent $400 on the filing fee, $65 to have TSHB served and $75 to have NICO served.

12.   It costs money in reports to sell a house.  Typically a natural hazards disclosure is

purchased because sellers are required by law to disclose if the properrt is in a  Special

flood hazard area,  Dam failure inundation area,   Very high fire severity,  Wildfire zone

Earthquake fault zone and   Seismic hazard zone. It not easy these reports and I have

never met anyone who did on their own (20 years experience selling real estate).

13.   I searched the Sacramento County Recorders records in June and did not see any

records of TSHB as a buyer.  I filed the complaint on the 10th of October, but I did start

working on in in the middle of September. I believe I made a second check while I was

drafting the complaint.

14.   I am a real estate broker for 20 years now. In my opinion, there is no advantage to

contact sellers directly (if purchasing for value) when there are many suitable options

41

for sale on the MLS.  The chances of finding a seller are remote.  About 4% of SFR's turn over ever year, or about 1% a quarter.  That means a person would have to contact on average 100 people to find just one interested person.  If buyer preferences are factored in like bedrooms, floor plan, condition, it could be impossible unless targeting a specific neighborhood.  The alternative is to look on the MLS and companies like Redfin have a rebate program for buyers which credit a buyer that uses Redfin part of the real estate agent's commission. This could be thousands of dollars.

15.     The calls in my complaint.

a.

| Date | Time | Number | Caller id display | method |
|------|------|--------|-------------------|--------|
| 6/2/2022 | 9:48 AM | 209-309-5602 | GROVELAND CA | call |
| 6/3/2022 | 4:18 PM | 209-299-4184 | STOCKTON CA | call |
| 6/3/2022 | 4:27 PM | 707-540-2482 | CONTRERAS ANGEL | text |
| 6/3/2022 | 4:30PM | 707-540-2482 | CONTRERAS ANGEL | text |
| 6/7/2022 | 5:05 PM | 279-356-8943 | Not Available | Call |
| 6/8/2022 | 5:06 PM | 707-540-2482 | CONTRERAS ANGEL | call |

16.     I called back 209-309-5602, 209-299-4184 and found them to be non-working.  By non working, the calls did not ring or make any indication that the numbers could accept incoming calls or had been disconnected.  The call simply would not work and I think the proper term is unassigned.

17.     I responded to an email Mr. Torres sent me and said I would start working on the complaint on 9/18/22,  I did not file the complaint until October.

18.     Plaintiff is suspicious of the claim that Mr. Torres scrubbed his number and I emailed him back "47 cfr 64.1200 c(2)(D) allows a company that makes a call to escape

42

liability if they can prove that they tried to prevent phone calls to people on the DNC registry.  In your situation, if you cant prove you accessed the database- its becomes proof that you lied about scrubbing and forms the basis of a willful and knowing violation

19.  I think defendants got my number by skiptracing or searching a property address against a phone database.  The defendants were looking for

20.  Neither TSHB or NICO have elected to  call back or even email plaintiff to discuss filing a response or resolving my complaint.

21.  I  believe that TSHB and NICO thought they were hiding from or avoiding culpability by using spoofed numbers. In my experience, telemarketers will play coy and not initially divulge who they are. NICO initially say "WE" just sold a house, but doesn't say who WE is.  NICO also said he was a real estate agent, but he did not have a license. It's a game that telemarketers play to avoid detection.

22.  We never got any postcards or mailers from Top Shelf of Nico.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 14th day of May 2023 in Sacramento, CA.

Mark Aussieker

43